In re Interest of Jorius G. and Cheralee G., children
under 18 years of age.
State of Nebraska, appellee, v. Leann G. and Dee and
Leonard Brown, appellees, and Department of Social
Services, appellant.

546 N.W.2d 796

Filed April 19, 1996.   No. S-95-709.

Don Stenberg, Attorney General, Royce Harper, and Beth Tallon, Special Assistant Attorney General, for appellant.

Joy Shiffermiller, of Ruff, Nisley & Lindemeier, for appellees Brown.

White, C.J., Caporale, Fahrnbruch, Lanphier, Wright, Connolly, and Gerrard, JJ.

Wright, J.

The Department of Social Services (DSS) appeals the decision of a juvenile review panel which affirmed the Lincoln County Court's denial of a change of placement recommended by DSS.

## SCOPE OF REVIEW

Juvenile cases are reviewed de novo on the record, and the appellate court is required to reach a conclusion independent of the trial court's findings; however, where the evidence is in conflict, the appellate court will consider and may give weight to the fact that the trial court observed the witnesses and

accepted one version of the facts over another. *In re Interest of J.T.B. and H.J.T.*, 245 Neb. 624, 514 N.W.2d 635 (1994).

## FACTS

This case involves the foster care placement of Jorius G. and Cheralee G., children who have been adjudicated to be within the meaning of Neb. Rev. Stat. § 43–247(3)(a) (Reissue 1993) as being without proper support through no fault of their parent. Prior to adjudication, the children's mother had custody of them. After adjudication, the Lincoln County Court, sitting as a juvenile court, placed the care and custody of the children with DSS for foster care placement. The children were subsequently placed by DSS with Dee and Leonard Brown on January 6, 1992.

On December 17, 1993, the mother entered into an open adoption agreement which purported to relinquish her parental rights to the Browns. The father was not involved because his parental rights were terminated. The adoption agreement had the initial support of DSS, which began a home study of the Browns.

Dennis O'Brien, a DSS caseworker, was assigned to the children in April or May 1994, and thereafter, DSS requested an evaluation of the Browns' appropriateness as adoptive parents. A psychological evaluation of the Browns was performed by Dr. Stephen Skulsky on September 10, 1994. Skulsky's conclusion was that "[u]nder the best of circumstances the Brown family would not be a good adoptive family for the children. . . . If no other more encompassing positive adoptive placements occur, of course, the Browns could be considered for placement of the children."

Following this evaluation, DSS determined that the Browns should not be permitted to adopt the children. Instead, DSS sought to change placement from the Browns to placement with a sister of the children's father. DSS filed a notice of change of placement, and on April 6, 1995, a hearing was held for an immediate review of placement by the Lincoln County Court. Present at the hearing were the deputy county attorney, the children's guardian ad litem, the mother and her counsel, and the Browns and their counsel.

Evidence in support of the change of placement was adduced by the deputy county attorney. The Browns presented evidence in opposition to the change of placement, and the guardian ad litem questioned witnesses from both sides. After reviewing the evidence, the county court held that a change of placement was not in the children's best interests. Upon review, a juvenile review panel affirmed the judgment of the county court. DSS now appeals.

## ASSIGNMENTS OF ERROR

DSS assigns the following errors to the juvenile review panel: (1) The panel did not address the issue of whether foster parents have standing to object to a change of placement and (2) the panel erred in affirming the April 6, 1995, order of the county court.

## ANALYSIS
### STANDING OF FOSTER PARENTS

DSS argues that the Browns, as foster parents, do not have standing to object to DSS' plan to change placement of the children from the Browns' foster care. DSS claims that the parties who have standing to object to DSS' actions with respect to a change of placement are limited to those parties listed in Neb. Rev. Stat. § 43–285(2) (Reissue 1993), which provides:

> Following an adjudication hearing at which a juvenile is adjudged to be under subdivision (3) of section 43–247, the court may order the department to prepare and file with the court a proposed plan for the care, placement, and services which are to be provided to such juvenile and his or her family. . . . If any other party, including, but not limited to, the guardian ad litem, parents, county attorney, or custodian, proves by a preponderance of the evidence that the department's plan is not in the juvenile's best interests, the court shall disapprove the department's plan.

DSS points out that foster parents are not specifically included in § 43–285(2) and that, therefore, the court should not have admitted any evidence offered by the Browns at the dispositional hearing. DSS claims that without the evidence introduced on behalf of the Browns, its plan would have been

adopted. DSS was not present at the hearing, and the record does not indicate that DSS requested a continuance in order to secure legal counsel. Nevertheless, DSS complains that because it had no legal representation at the hearing, the county court should have on its own motion considered the issue of standing.

Section 43–285(3) provides:

> The department . . . shall file a report and notice of placement change with the court and shall send copies of the notice to all interested parties . . . before the placement of the juvenile is changed from what the court originally considered to be a suitable family home or institution to some other custodial situation . . . . The court, on its own motion or upon the filing of an objection to the change by an interested party, may order a hearing to review such a change in placement and may order that the change be stayed until completion of the hearing. . . . The department or any other party may request a review of the change in placement by a juvenile review panel in the manner set out in section 43–287.04.

Considering the language of § 43–285(2) and (3), we conclude that foster parents are interested parties. Section 43–285(2) states: "If any other party, *including, but not limited to*, the guardian ad litem, parents, county attorney, or custodian, proves by a preponderance of the evidence that the department's plan is not in the juvenile's best interests, the court shall disapprove the department's plan." (Emphasis supplied.)

The Foster Care Review Act, Neb. Rev. Stat. §§ 43–1301 to 43–1318 (Reissue 1993), addresses the "placements of neglected, dependent, or delinquent children." See § 43–1301(4). In the case at bar, the children were adjudicated to be without proper support through no fault of their parent under § 43–247(3)(a). Children without proper support under § 43–247(3)(a) meet the definition of "neglected" or "dependent" children under § 43–1301(4). Thus, the standing provisions of the Foster Care Review Act aid our determination of who is an interested party under § 43–285.

To this end, § 43–1314 provides:

> Except as otherwise provided in the Nebraska Indian Child Welfare Act, notice of the court review and the right

of participation in all court reviews pertaining to a child in a foster care placement shall be provided by the court having jurisdiction over such child for the purposes of foster care placement either in court, by mail, or in such other manner as the court may direct. Such notice shall be provided to: (1) The person charged with the care of such child; (2) the child's parents or guardian unless the parental rights of the parents have been terminated by court action as provided in section 43–292 or 43–297; (3) the foster child if age fourteen or over; (4) the foster parent or parents of the foster child; (5) the guardian ad litem of the foster child; and (6) the state board.

Section 43–1314 states that foster parents shall have notice and the right to participate in all court reviews pertaining to a child in foster placement. Therefore, we conclude that the Browns have standing to participate in the foster care placement review as foster parents.

There is another reason why the Browns have standing. The children's mother has consented to an open adoption by the Browns and has signed a relinquishment to that effect. We have held that in a private adoption, the adoptive family stands on equal ground with a natural mother with respect to a determination of custody. For example, in *Lum v. Mattley*, 208 Neb. 789, 305 N.W.2d 878 (1981), a natural mother had relinquished custody of her child and sought return through a writ of habeas corpus. We held that after the valid relinquishment of the child by the natural mother, the adoptive family stood on equal ground with the natural mother with respect to determining custody. Likewise, in *Yopp v. Batt*, 237 Neb. 779, 467 N.W.2d 868 (1991), we recognized that upon execution of a valid relinquishment for adoption, the natural parent's rights were no longer superior to those of the prospective adoptive family and that the prospective adoptive family had standing to contest custody. In the present case, the children's mother has given a valid relinquishment in favor of the Browns. Therefore, as prospective adoptive parents, the Browns have standing to contest DSS' plan.

DSS' reliance upon *In re Interest of S.R.*, 217 Neb. 528, 352 N.W.2d 141 (1984), in support of its position that the Browns

do not have standing in the case is misplaced. In that case, the child was adjudicated as lacking proper parental care under § 43-247 and was placed in the temporary care of the child's grandparents. The parental rights of the child's parents were subsequently terminated. The juvenile court then removed the child from the grandparents' home and placed the child for potential adoption with the Nebraska Children's Home Society. The district court affirmed the change of placement, and the grandparents attempted to appeal. We held that the grandparents did not have standing because any connection they had with the child was legally severed by the termination of parental rights. On the factual basis alone, *In re Interest of S.R.* is distinguishable from the present case and, therefore, has no application.

## COUNTY COURT ORDER

Section 43-285(2) provides the applicable standard for adjudicating changes in placement: "If any other party, including, but not limited to, the guardian ad litem, parents, county attorney, or custodian, proves by a preponderance of the evidence that the department's plan is not in the juvenile's best interests, the court shall disapprove the department's plan." Our review is de novo on the record, and we are required to reach a conclusion independent of the trial court's findings. See *In re Interest of J.T.B. and H.J.T.*, 245 Neb. 624, 514 N.W.2d 635 (1994).

At some point during the foster care placement with the Browns, DSS decided that the adoption by the Browns should not be completed. When O'Brien was assigned to the case in April or May 1994, he requested a psychological evaluation of the Browns as adoptive parents. O'Brien testified that he requested the evaluation upon learning that the Browns maintained a second residence where Leonard slept. Leonard has apnea and significant snoring problems that require these sleeping arrangements.

Skulsky met briefly with the Browns and the children as a group and gave the Browns a few psychological tests. Skulsky reported that at the beginning of his interview, Dee Brown was pulling two chairs out of the interview room into the hallway.

She expressed irritation at music playing in the waiting room and appeared to be moving the chairs to avoid frustrations associated with the room. Skulsky stated that this behavior suggested that Dee had "such an easily upset frustration tolerance that it led her to somewhat inappropriate behaviors."

Skulsky reported a few observations that were noted in the Browns' foster care record. A DSS caseworker had opined that the Browns had a tendency to react quickly or overreact to some situations and seemed to internalize and place blame on themselves even when no one was at fault. The caseworker felt that Dee Brown was easily put into a stress mode if she was not prepared for a stressful situation. Skulsky referred to a letter from a Dr. Zedek, a psychiatrist in North Platte, who had stated that Dee has a severe form of attention deficit hyperactivity disorder, adult residual type. Zedek stated in his letter that Dee had difficulty following through with the simplest of instructions. Skulsky also noted that Leonard has a snoring problem and that he maintains a separate residence for sleeping purposes.

Skulsky's recommendations were as follows:

1. Of course any recommendations about adoption needs to take into account the possible options for given children. Under the best of circumstances the Brown family would not be a good adoptive family for the children. While they display an excellent capacity to create fun activities– the travel, the books filled with pictures of family events– and to help connections exist with the family of origin of these children, the Browns['] capacity to provide an emotional system where the children can both grow strong and close and challenge the parents as the children effect separation processes in later childhood and teen–aged years seems deeply blunted. The fact that Mr. Brown is so dependent on Mrs. Brown and that Mrs. Brown is not likely to be a good counseling candidate furthers this conclusion.

2. If no other more encompassing positive adoptive placements occur, of course, the Browns could be considered for placement of the children. The Browns[']

skills seem particularly suited to short[-] to mid[-]term foster care placements for children.

O'Brien testified that DSS' decision to change placement of the children was based on Skulsky's evaluation of the Browns, a letter from Zedek stating that Dee Brown was unable to make the simplest decisions, and a 1991 home study stating that the Browns would be appropriate for short-term placements only and would not be appropriate for long-term placements. Upon cross-examination, O'Brien admitted that the Browns gave the children appropriate care, including food and health care, and that there were never any physical problems with the care of the children.

The Browns introduced substantial evidence against the change of placement. Kendra Leonhardt, a certified professional counselor and psychotherapist who served as the children's therapist since February 1993 and worked closely with the Browns in the children's development, testified that when the children were first placed with the Browns, they had a significant amount of emotional instability and psychological issues relating to past physical and sexual abuse. One of the children had manifested a number of problems associated with this abuse. The child was having a hard time staying concentrated on a task, was wetting the bed, and was getting up at night and hoarding food. Leonhardt testified that the children's behavior had been stabilizing since their placement with the Browns and that they were responding well to the Browns' care. Leonhardt had warned DSS about the destructive impact that the transition to a new placement would have on the children. She noted that as soon as the children became aware that they were going to be removed from the home, they began to regress into their past behaviors. Leonhardt's professional opinion was that adoption by the Browns would be in the children's best interests.

Monica Kramer, one of the children's schoolteachers, testified that the Browns were very concerned parents and were very cooperative with her on behalf of the children. The teacher reported that Cheralee had shown notable progress in school during the time that she was living with the Browns, but had recently regressed in her performance. Kramer reported seeing

a definite deterioration in Cheralee's behavior once she understood she would be leaving the Browns. Cheralee once burst out crying in front of her classmates and explained that she was going to have to leave home. Kramer's testimony confirms Leonhardt's assessment of the positive relationship between the Browns and the children. The guardian ad litem also opposed the change of placement from the Browns.

Juvenile cases are reviewed de novo on the record, and the appellate court is required to reach a conclusion independent of the trial court's findings; however, where the evidence is in conflict, the appellate court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *In re Interest of J.T.B. and H.J.T.*, 245 Neb. 624, 514 N.W.2d 635 (1994). From our review, we find that the Browns have proved by a preponderance of the evidence that the proposed change of placement would not be in the best interests of the children.

## CONCLUSION

The judgment of the juvenile review panel is affirmed.

AFFIRMED.