558 Pa. 116 (1999)
735 A.2d 1226
In the Interest of G.C., A Minor Child.
Appeal of M.S. and B.S. (Two Cases).
Supreme Court of Pennsylvania.
Argued December 9, 1997.
Decided July 22, 1999.
*117 Thomas L. Wenger, Thomas A. Hutton, Harrisburg, for Marvin and Brenda Schadel, Appellants.
Jeffrey L. Mensch, Mifflinburg, for G.C., A Minor Child.
Leslie W. Bryden, Sunbury, for Amy Pursel, Natural Mother.
David D. Noon, Sunbury, for David & Maryanne Pursel.
John A. Carpenter, Sunbury, Michael Robinson, for Northumberland Co. Child and Youth.
Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

ORDER
PER CURIAM.
The Court being equally divided, the Order of the Superior Court is AFFIRMED.
Chief Justice FLAHERTY and Justice CAPPY join this Opinion In Support of Affirmance.
Justice NIGRO files an opinion in support of reversal.
Justice NEWMAN files an opinion in support of reversal in which Justice CASTILLE joins.

OPINION IN SUPPORT OF AFFIRMANCE
ZAPPALA, Justice.
The sole issue before us on appeal is whether foster parents have standing to seek or contest awards of custody concerning their foster children. The Superior Court held that they do not have standing. We affirm.
*118 On July 24, 1992, G.C. was born to Amy Pursel and Travis C. On September 21, 1992, G.C. was admitted to Geisinger Medical Center suffering from trauma, bruising around his left eye, a torn upper frenulum and a displaced left parietal skull. On the same day G.C. was admitted to the emergency room, Northumberland County Children and Youth Services (CYS) received anonymous information indicating that G.C.'s injuries were a direct result of serious child abuse. This allegation was later confirmed by a CYS investigation and independent medical evidence. Five individuals were named by the anonymous source as possible perpetrators of the abuse; one of the named individuals was G.C.'s maternal grandfather, David Pursel.
On September 25, 1992, upon his release from the hospital, G.C. was placed in the care of Appellants, foster parents approved by CYS. G.C. was adjudicated dependent and legal custody was awarded to CYS pursuant to the Juvenile Act, 42 Pa.C.S. § 6351. Following G.C.'s placement with Appellants, supervised weekly visits were scheduled at their home with G.C.'s natural parents and with his maternal grandfather, David Pursel. In March of 1993, David Pursel petitioned the court to place G.C. with him. This request was denied but G.C. was permitted to visit with David Pursel and his wife at their home beginning in September of 1993.
G.C.'s natural parents, without the consent or knowledge of CYS, asked Appellants if they would adopt G.C. and Appellants agreed. On February 4, 1994, CYS requested that Amy Pursel voluntarily relinquish her parental rights and she agreed to do so on the condition that Appellants be permitted to adopt G.C. CYS refused the condition and further decided that G.C. would not be placed with Appellants. On May 24, 1994, David Pursel filed a petition seeking physical custody of G.C. Appellants filed their own petition to retain physical custody of G.C.
After hearings, at which Appellants were granted provisional standing in order to develop an adequate record, the court *119 granted physical custody of G.C. to David Pursel; legal custody remained with CYS.[1] Appellants appealed this decision to the Superior Court and the court addressed the question of whether Appellants had standing to seek or contest the custody award issued by the trial court.
After an extensive review of its jurisprudence regarding the issue of foster parent standing, an equally divided en banc panel of the Superior Court concluded that foster parents lack standing to seek or contest custody awards concerning their foster children.[2] We are now asked to address this same *120 question and, for the reasons that follow, we agree that foster parents lack standing in custody proceedings.
The Superior Court has addressed the issue of foster parent standing in a number of cases in a number of different contexts. In determining whether foster parents have standing, the court's primary focus in all cases has been on the nature of the foster parent/child relationship as established by the Legislative scheme. In In re Adoption of Crystal D.R., 331 Pa.Super. 501, 480 A.2d 1146 (1984), the court addressed the issue of whether foster parents have standing to file petitions for the termination of parental rights. In Crystal, the foster parents were awarded physical custody of a two year old minor. After caring for the child for over four years, they filed a petition for the termination of parental rights and a report of their intention to adopt the child. The trial court entered an order terminating the natural parents' rights and awarded custody to the foster parents. On appeal, the Superior Court reversed based on its conclusion that the foster parents lacked standing.
In rejecting the argument made by the foster parents that they stood in loco parentis to the child, the court, generally, addressed the nature of the foster parent/child relationship.
The agency, while transferring physical custody to the foster parents, remains responsible for the care of the child, and may at any time be required by the child's interests to regain physical custody and terminate the foster parent's relationship to the child.
Id. at 505, 480 A.2d at 1149. Citing the United States Supreme Court's decision in Smith v. Organization of Foster Families, 431 U.S. 816, 826-28, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (footnotes and citations omitted), the court further noted that:
[t]he law transfers "care and custody" to the agency, . . . but day-to-day supervision of the child and his activities, and most of the functions ordinarily associated with legal custody, are the responsibility of the foster parent. Nevertheless, agency supervision of the performance of the foster *121 parents takes forms indicating that the foster parent does not have full authority of a legal custodian. Moreover, the natural parent's placement of the child with the agency does not surrender legal guardianship: the parents retain authority to act with respect to the child in certain circumstances.
Crystal, 331 Pa.Super. at 508, 480 A.2d at 1150. The Legislature has further defined the nature of the foster parent/child relationship by setting forth how the agency is to supervise the performance of the foster parents.
Before a child may be placed in a foster home, the home must be approved by the agency. 35 Pa.Code § 3130.39. If their home is approved, the foster parents are paid for providing care for the child. 42 Pa.C.S. § 6306; 62 P.S. § 704.1. The agency supervises the placement, which entails enforcing regulations governing the child's health, § 3700.51, safety, § 3700.67, and discipline, § 3700.63, and in appropriate circumstances the agency may remove the child from the foster home....
Id. at 509, 480 A.2d at 1150 (citations omitted). Based on the foregoing, the court in Crystal observed that "[t]he Legislature has provided that the relationship between the foster parents and the child is by its very nature subordinate both to the relationship between the agency and the child and to the relationship between the child and the child's parents." Id.
Given the subordinate nature of the foster parent/child relationship, the Crystal court further noted the following:

[F]oster parents may not by pleading their love for the child escape their legal status. For in defining the foster parents' status as subordinate both to the agency's and to the child's parents', the Legislature has in no sense acted arbitrarily. Quite to the contrary, the foster parents' status reflects the Legislature's conviction that if possible, a child should grow up with its parents. When under the Juvenile Act a child is found dependent, the court may transfer to the agency only "temporary legal custody" of the child. 42 Pa.C.S. § 6351(a)(2). The Legislature has recited that the purpose of this limitation is to "preserve the unity of the *122 family whenever possible...," 42 Pa.C.S. § 6301(b)(1), and further, that this purpose is to be achieved "in a family environment whenever possible, separating the child from parents only when necessary for his welfare or in the interests of public safety." 42 Pa.C.S. § 6301(b)(3). It is the foster parents' responsibility to help to achieve these purposes  not to subvert them. When foster parents enter into their relationship with the child, they know that the relationship is temporary; the agency has the authority to remove the child; and that the parents have the right to visit the child. 55 Pa.Code § 3700.37 ....
Id. at 510, 480 A.2d at 1151 (emphasis added).
Ultimately, the Crystal court concluded that because the relationship between foster parent and child is by its nature subordinate both to the relationship between the agency and the child and to the relationship between the child and the child's parents, it is the responsibility of the agency, not the foster parents, to seek a permanent home for the child. Thus, the court held the foster parents lacked standing to petition for the termination of parental rights.
In Priester v. Fayette County Children and Youth Services, 354 Pa.Super. 562, 512 A.2d 683 (1986), the court addressed the issue of whether former foster parents had standing to pursue an action for custody. In Priester, appellants, foster parents, were initially approved and given physical custody of a minor child. Pursuant to a subsequent court order, the child was placed in another foster home in which the child's brother resided. Appellants later filed a complaint seeking custody. Their complaint was later dismissed by the trial court for lack of standing. The Superior Court affirmed. Citing Crystal, the court emphasized that it is the nature of the foster parent/child relationship which warrants the conclusion that foster parents lack standing to seek custody.
By its very nature, the foster parent/child relationship "implies a warning against any deep emotional involvement with the child since under the given insecure circumstances this would be judged as excessive."
*123 Id. at 565, 512 A.2d at 684 citing Crystal, 331 Pa.Super. at 510, 480 A.2d at 1151.
Following the same reasoning, the Superior Court, in In re Adoption of S.C.P., 364 Pa.Super. 257, 527 A.2d 1052 (1987), held that former foster parents lacked standing to pursue adoption proceedings without the consent of the child youth services agency. The court noted that the reasoning employed in Priester to the facts of the case "effectively resolves this appeal" despite the fact that Priester dealt with the question of foster parent standing in custody proceedings as opposed to foster parent standing in adoption proceedings. Obviously, the court did not feel that the factual scenario dictated its result, rather, the court again relied on the special nature of the relationship between foster parents and their foster children. The court noted the following regarding R.L.L. and M.A.L., the foster parents.
R.L.L. and M.A.L., as experienced foster parents, knew that they were embarking on a temporary relationship. They should not be permitted to circumvent the ephemeral expectations upon which the foster parent concept was designed.
S.C.P., 364 Pa.Super. at 261, 527 A.2d at 1054.
More recently, in Chester County Children and Youth Services v. Cunningham, 431 Pa.Super. 421, 636 A.2d 1157 (1994), the Superior Court again addressed the issue of foster parents' standing to adopt their foster children without the consent of the child youth services agency. Citing its rationale in Crystal, Priester and S.C.P., the court reiterated that foster parents lack standing to pursue adoption proceedings without the consent of the agency that has legal custody of the child; however, the court pointed out that "[t]he agency's withholding of consent is not the significant aspect of this precept; rather, it is the nature of the limited relationship of the foster parents to the children." Id. at 423, 636 A.2d at 1159.
The court rejected the argument that our decision in In re Adoption of Hess, 530 Pa. 218, 608 A.2d 10 (1992) warranted a contrary result. In Hess, the grandparents of two children placed in the custody of a family services agency sought to *124 intervene in an adoption proceeding in order to stay the proceedings, and in order to obtain custody of their grandchildren, whom they had cared for extensively throughout their youth. The family services agency filed preliminary objections alleging the grandparents lacked standing to intervene, which the trial court sustained. The Superior Court reversed and we affirmed its decision.
In distinguishing Hess from the matter before it, the Superior Court noted that this Court placed great emphasis on the familial relationship between the grandparents and the children.
In analyzing the applicability of Hess to the instant case, we have no doubt that the Supreme Court clearly was persuaded by the significance of the relationship of the grandparents to the children. The Court repeatedly emphasized this fact. The entire analysis by the Supreme Court revolved around the relationship of the appellees to the children. Indeed, the Court relied upon specific statutory provisions exclusive to grandparents. For example, the Court noted that 23 Pa.C.S. § 2531(c) specifically envisions that grandparents might choose to adopt their grandchildren. The Court stated "[T]he Act contemplates that a grandparent might choose to adopt his or her grandchild, and allows the grandparent to benefit from the relationship to the child by relieving the grandparent of the obligation to file a Report of Intention to Adopt." The Court went on to state that the various requirements indicate "that a relationship between the proposed adoptive parent and the adoptee is a relevant consideration." There is no such relationship here.
Id. at 425-26, 636 A.2d at 1160 (citations omitted). Thus, the Superior Court held that Hess was confined to its facts, none of which were present before the court in Chester. An equally divided panel of this Court affirmed the Superior Court's determination in Chester.
We are persuaded by the overwhelming analysis of the Superior Court regarding the uniquely limited and subordinate, state-created, agency-maintained, foster parent/child relationship established through the Legislative scheme, that *125 foster parents lack standing to seek or contest custody of their foster children.[3]
Appellants assert that the Superior Court's decisions in Kellogg v. Kellogg, 435 Pa.Super. 581, 646 A.2d 1246 (1994), In re Interest of Tremayne Quame Idress R., 286 Pa.Super. 480, 429 A.2d 40 (1981), and Stapleton v. Dauphin County Child Care Service, 228 Pa.Super. 371, 324 A.2d 562 (1974), dictate a contrary result. We disagree.
Kellogg is easily distinguishable from the case at bar as the matter therein did not involve or discuss foster parents. To the contrary, in Kellogg a custody action was commenced by the first wife of a man whose second wife had him murdered. The first wife sought custody of the children of the second marriage. In concluding that the first wife had standing, the Superior Court neither relied on nor cited any of the numerous cases it had previously decided regarding foster parent standing as impacting on its decision. In fact, the court specifically noted, "we find no precedential case or statute addressing directly the standing of a third party seeking custody as against another third party...." Id. at 587, 646 A.2d at 1249.
The Superior Court's discussion of Tremayne in Kellogg discloses that it is also inapplicable to our discussion. The court stated:
Research reveals that there are cases wherein a third party has sought custody of a child who is in the custody of another third party. In [Tremayne,] a foster mother and maternal grandmother both sought custody of a child. The trial court ruled that the foster mother should be awarded custody and a panel of this court found no abuse of discretion *126 in that decision and affirmed. While the court discussed the "equally allocated burden of proof" in a custody dispute between two third parties, it did not address the standing issue.

Id. at 588, 646 A.2d at 1250 (emphasis added).
Finally, Appellants maintain that the Superior Court's decision in Stapleton conflicts with its decision in Priester and establishes that foster parents have standing in custody proceedings. We recognize, as did the Superior Court, that Stapleton and Priester are in conflict. See Mitch v. Children and Youth S.S. Agency, 383 Pa.Super. 42, 556 A.2d 419 (1989) (court declined to address conflict in Stapleton and Priester since the matter before the court involved prospective adoptive parents, not foster parents). Stapleton addressed the issue of foster parent standing to protest, through a petition for custody, an agency decision to remove their foster child. The court resolved the standing issue by noting that the then applicable Juvenile Act[4] permitted "any person" to file a petition raising the issue of who should have custody of the child. The court stated, "[i]t is difficult to see how standing could have been defined any more broadly." Stapleton, 228 Pa.Super. at 379, 324 A.2d at 567.
Regarding the precedential value of Stapleton, it should be noted that Stapleton was decided in 1974, more than ten years prior to the Superior Court's decision in Priester, wherein the court reached a contrary result. Thus, although Priester did not specifically address Stapleton in its decision, it appears that Priester implicitly overruled Stapleton. Given the conflict between the two cases and the overwhelming number of cases decided by the Superior Court specifically addressing the issue of foster parent standing wherein the court has reached a contrary result, we find that Stapleton has no precedential value. To the extent that Priester did not overrule Stapleton, we do so now.
*127 In addition to the foregoing, we wish to point out that the Legislature has specifically provided foster parents with the right to administratively appeal the relocation of their foster children. 55 Pa.Code. § 3700.73 provides in relevant part:
§ 3700.73 Foster parent appeal of child relocation.
(a) Foster parents may appeal the relocation of a child from the foster family except under one of the following conditions:
(1) The child has been with the foster family less than 6 months.
(2) The removal is initiated by the court.
(3) The removal is to return the child to his parents.
(4) The removal is to place the child for adoption.
(5) An investigation of a report of alleged child abuse indicates the need for protective custody....

* * * * * *
(c) Foster parents who wish to appeal the relocation of a child shall submit to the FFCA a written appeal to be postmarked no later than 15 days after the date of notice of their right to appeal the child's relocation.
(d) Upon receipt of the foster parent's appeal, the FFCA shall date stamp the appeal and submit it to the Department's Office of Hearings and Appeals....
(e) If a foster parent submits an appeal in accordance with subsection (c) and the foster parent has the right to appeal in accordance with subsection (a), the child shall remain in the foster family home pending a decision on the appeal.
(f) Parties to an appeal of a child's relocation may be represented by an attorney or other representative.
Thus, while the Legislature has provided foster parents with a specific administrative remedy where their foster child is to be relocated, no such similar provision has been provided specifying that foster parents are permitted to seek or contest custody awards of their foster children where relocation is imminent.
*128 Based on the foregoing, we are compelled to adopt the reasoning of the prior decisions of the Superior Court, Crystal, Priester, and S.C.P., which more accurately reflect the role of foster parents as intended by the Legislature. Accordingly, we affirm the orders of the Superior Court.
Chief Justice FLAHERTY and Justice CAPPY join this Opinion In Support of Affirmance.
Justice NIGRO files an opinion in support of reversal.
Justice NEWMAN files an opinion in support of reversal in which Justice CASTILLE joins.

OPINION IN SUPPORT OF REVERSAL
NIGRO, Justice.
I would reverse the order of the Superior Court as I believe that Appellants have standing to contest a petition to transfer custody of their foster child to a third party. Specifically, I find that Appellants have the necessary substantial, direct and immediate interest in this contest to have standing. I further find that the reliance by the Opinion in Support of Affirmance on In re Adoption of Crystal, 331 Pa.Super. 501, 480 A.2d 1146 (1984), to support its decision is misplaced. In Crystal the Superior Court found that, under the Adoption Act, foster parents did not stand in loco parentis to their foster child. A determination that foster parents do not stand in loco parentis under the Adoption Act, however, is not determinative of whether those foster parents have standing under the Juvenile Act.
Additionally, I believe we must not lose sight of the fact that the aim of the court system is to provide the presiding judge with the relevant information necessary for him to make a fair, just and equitable decision. Granting standing to foster parents furthers this purpose as they have primary physical custody and, more than likely, have insight and information bearing on the best interests of the child which would not otherwise come to the court's attention. The information *129 gleaned from such advocacy can only enrich the judge's arsenal and aid him in determining who shall care for the child.
Finally, I fail to see what prejudice would accrue either to the interests of the child or to the goals of the foster care system by affording standing to similarly situated foster parents. Therefore, in light of the advantages to be gained, I would find that Appellants have standing under the Juvenile Act to challenge the third party's petition for custody.
Accordingly, I would reverse the order of the Superior Court.

OPINION IN SUPPORT OF REVERSAL
NEWMAN, Justice.
We are confronted with the sole issue of whether the Juvenile Act grants standing to these foster parents to file a petition. I conclude that the plain wording of Section 6351 of the Juvenile Act confers standing on "any person" to file a petition. Thus, these foster parents should have standing to seek a petition pursuant to the Juvenile Act[1] regarding a foster child who has been in their physical custody for nearly two years. Moreover, foster parents who have cared for and nurtured a child for almost two years, since the child was two months old, in essence acting as de facto parents, have a direct, substantial and immediate interest in the foster child. Particularly here, where the underlying issue involves whether a grandparent, who had been suspected of abusing the child, may petition the court to remove the child from their care. These foster parents have a real interest in this child's welfare, and in fact may have a limited liberty interest in that foster care relationship. See, e.g., Smith v. Organization of Foster Families For Equality and Reform, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). Further, foster parents have valuable information concerning the best interests of the child and should have a voice before the juvenile court. Thus, we should convey standing upon foster parents to seek a *130 petition and should grant these parents a right to be heard in order to contest a petition to transfer custody from their care.[2]
Nonetheless, the Opinion of the Majority denies standing to these foster parents because of "the uniquely limited and subordinate, state-created, agency-maintained, foster parent/child relationship." I am at a loss to understand why the apparently "subordinate" status between the agency and the foster parents has any bearing on whether the foster parents have standing to file a petition pursuant to the Juvenile Act, or a right to contest one that the child's grandfather has filed. In my review of this Court's determinations, we have never, before today, required that to have standing a person's interest in the outcome of litigation be paramount to all other citizens, nor that he or she lacks standing simply because his or her interest might be subordinate to another entity.[3]
*131 Instead, the pertinent focus in deciding the standing of a party is an analysis of the interest of that party in the subject matter of the dispute, not a weighing of his or her interest compared with another party. See generally Wm. Penn Parking Garage, Inc. v. City of Pittsburgh, 464 Pa. 168, 346 A.2d 269 (1975) (standing focuses on nature of party's interest in connection with challenged action). The analysis that this Court has long adopted to determine standing has been as follows:
As a general matter, the core of the concept of standing is that a person who is not adversely affected in any way by the matter he seeks to challenge is not aggrieved thereby and has no right to obtain a judicial resolution of his challenge.... [W]hat is necessary to render a person aggrieved is that the party has a substantial, direct and immediate interest in the claim sought to be litigated.
Kuropatwa v. State Farm Insurance Company, 554 Pa. 456, 721 A.2d 1067, 1069 (1998) (citations omitted, emphasis added). For standing, a person must have a "substantial" interest in the outcome of litigation, but such interest must only surpass the "common interest" of all citizens in "procuring obedience to the law." Id. In the case at bar, it is clear to me that the foster parents have a "substantial interest" in the litigation at issue  that is whether their foster child is removed from their home and is placed with the child's grandfather.
The Majority disregards these time-honored standing concepts and wholeheartedly adopts the reasoning of several Superior Court cases, which have held that foster parents do *132 not have standing because their status is "subordinate" to that of the agency. See, e.g., In re Adoption of Crystal D.R., 331 Pa.Super. 501, 480 A.2d 1146 (1984) (Crystal D.R.); Chester County Children and Youth Services v. Cunningham, 431 Pa.Super. 421, 636 A.2d 1157 (1994); In re Adoption of S.C.P., 364 Pa.Super. 257, 527 A.2d 1052 (1987) and Priester v. Fayette County Children and Youth Services, 354 Pa.Super. 562, 512 A.2d 683 (1986). I believe these cases are not authoritative, and the Majority is led astray in relying upon them.
In Crystal D.R., the sole focus of the court was to construe the Adoption Act, not the Juvenile Act at issue here. The section of the Adoption Act before the Crystal D.R. court, Section 2512(a)(3), indicated that only an individual "in loco parentis" to a child could file a petition for a termination of parental rights.[4] In finding that foster parents were not "in loco parentis," the Superior Court determined that the relationship of the foster parents to a child was subordinate to the agency, citing a case of the United States Supreme Court, Smith v. Organization of Foster Families, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (Smith). The Superior Court reasoned that a subordinate status was different from a biological parent and thus was not "in loco parentis." The foster parents did not have standing to file the petition because they did not fit within the statutory definition of persons who could file, and not because of the general subordinate status of foster parents to the agency.
In the context of the Crystal D.R. case, unlike here, the discussion of the foster parents' alleged "subordinate" status *133 may have had relevance to whether the foster parents were "in loco parentis" to the child and thus had standing under the provision of the Adoption Act, which specifically limited standing to one in that legal relationship. Here, however, we are not confronted with standing under the Adoption Act, but rather the standing of foster parents pursuant to the Juvenile Act. The Juvenile Act at Section 6351, unlike the Adoption Act, does not limit petitioners to only those people who stand in loco parentis to the child.
In fact, the Juvenile Act specifically provides that "any person" may file a petition.[5] It is my belief that a discussion of the foster parents' "subordinate" status has no relevance concerning whether the foster parents have standing to sue, and a reliance on the holding of Crystal D.R. is wholly misplaced in the context of the Juvenile Act. Likewise, I believe that it is a misguided venture to rely on the Superior Court cases following Crystal D.R. (In re S.C., Chester County, and Priester, which the Majority favorably cites). In these cases, the Superior Court inappropriately relied on Crystal D.R. to support the conclusion that because the interest of the foster parents is "subordinate" to the agency, the foster parents have no standing to file any petitions related to the removal of the foster child from the foster home. These cases are based upon a faulty analysis of the relevance of the "subordinate" status of the foster family to the issue of whether the foster parents have standing to sue.
Moreover, these Superior Court cases misapply Smith v. Organization of Foster Families, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (Smith) to support the conclusion that foster parents lack standing because of their "subordinate status" to the agency. Regarding the issue of standing, *134 contrary to the inferences in these Superior Court cases, the United States Supreme Court in Smith determined, in dicta, that foster parents do have standing to assert claims regarding the removal of foster children from their care.[6] In specifically rejecting the argument that foster parents have no standing to challenge the constitutionality of the State of New York's procedures to remove foster children from a foster family's care, the Court stated that:
Appellants argue, with the dissenting judge below ... that in any event Appellee foster parents have no standing.... This argument misunderstands the peculiar circumstances of this lawsuit. Ordinarily it is true, a party would not have standing to assert the rights of another, himself a party in the litigation: the third party himself can decide how best to protect his interest. But children usually lack the capacity to make that sort of decision, and thus their interest is ordinarily represented in litigation by parents or guardians. In this case, however, the State, the natural parents, and the foster parents, all of whom share some portion of the responsibility for guardianship of the child, are parties, and all contend that the position they advocate is most in accord with the rights and interests of the children.... We believe that it would be most imprudent to leave entirely to court-appointed counsel the choices that neither the named foster children nor the class they represent are capable of making themselves, especially in litigation in which all parties have sufficient attributes of guardianship *135 that their (the foster parents) views on the rights of the children should at least be heard.

Id. at 841, n. 44, 97 S.Ct. 2094 (emphasis added).
These Superior Court decisions take a view of standing that is illogical, unsupported by any decision of this Court and unnecessarily restrict the ability of foster parents to file petitions that are filed to seek the best interests of foster children. In their holdings, they ignore traditional standing principles and precedent of this Court, which indeed suggests that foster parents have a right to contest dependency petitions. See In re Salemno, 369 Pa. 278, 85 A.2d 406 (1952)(where this Court, in a juvenile proceeding, heard the appeal of foster parents, who contested an award of custody).
Furthermore, these cases categorically identify foster parents as the wrong parties to bring or contest petitions simply because an agency has regulatory control and has the power to bring these petitions. We are not confronted with an "either/or" situation. Certainly, both the foster parents and the agency can have standing. Indeed, the Supreme Court of the United States has recently held that it is "self evident" that "more than one party may have standing to challenge a particular action or inaction." See, e.g., Clinton v. City of New York, 524 U.S. 417, 118 S.Ct. 2091, 2101, 141 L.Ed.2d 393 (1998).[7] Therefore, I find reliance on this line of Superior Court cases misplaced.
I am far more persuaded by the analysis of Judge Spaeth in Stapleton v. Dauphin County Child Care Service, 228 Pa.Super. 371, 324 A.2d 562 (1974). In Stapleton, Judge Spaeth determined that, based on the plain meaning of the Juvenile Act, foster parents had standing to file petitions for custody under the statute. The Juvenile Act states that "any person" *136 may file a petition pursuant to the Act, and foster parents certainly fell within the plain meaning of the term "any person". Id., 324 A.2d at 566-67. Judge Spaeth succinctly stated that:
It is difficult to see how standing could have been defined any more broadly.

* * * * * *
What appears to have caused confusion in this case is that the distinction between a party's standing and the court's standard of review has been overlooked. The fact that a stranger to the child ("any person including a law enforcement officer") has standing to file a petition with respect to the child implies nothing about the standard that the court will apply in deciding what action to take on the petition.
Id. at 567. I agree. The Juvenile Act plainly sets forth that "any person" can file a petition under the Act and there is no reason to deprive these foster parents of that right. The best interests of the child will guide the action that the Juvenile Court then takes in follow up to that petition.
Furthermore, I am concerned that the Majority condones a situation where the agency is given broad authority to make transfer of custody decisions, without consideration of all factors that are in the best interests of the child. Foster parents, who have dedicated their time to the child on a daily basis, can add valuable information to the dependency process. It is in the best interests of the child involved that all parties who have an interest in his welfare be heard by the juvenile court. While returning a child to his natural parents remains an important goal, when a biological parent is unable to care for the child, society must rely upon available resources, including the foster parents, to fill the role and at times to become adoptive parents.[8] When a child's parents are unable *137 to care for him, we should encourage foster families to provide nurturing and supportive homes, and one of the ways to accomplish this is to keep foster parents part of the solution, not to exclude them from custody decisions.
A foster child must rely upon a myriad of legal and social resources to fill the void left when his or her own parents are unable to provide basic nurturing, care and guidance. To resolve what custody arrangement is best for any child that is adjudicated dependent under the Juvenile Act, the court should have the input of all interested parties, not simply an overburdened social service agency. The combined effort of all interested parties, whether they be the agency, the extended family or foster parents, is essential to decide what custody arrangement is best. Simply because a court grants a party standing to seek, or the right to contest, a determination pursuant to the Juvenile Act, does not mean that the court must grant that petitioner relief. See Salemno, supra (where this Court heard appeal of foster parents, but affirmed award of custody to natural mother). It only means that all petitions filed by an interested party will be heard, according to the Act.
To do what the Majority has done and to relegate the foster parents' interest as merely "subordinate" and "temporary" *138 ignores the reality of the foster care system, where almost twenty percent of children who are placed in foster care will remain for more than five years, and the average foster care stay is two years. See, e.g., Kathleen A. Bailee, The Other Neglected Parties in Child Protective Proceedings: Parents in Poverty and the Role of the Lawyers Who Represent Them, 66 Fordham L.Rev. 2285, 2290 (1998). Further, I believe that to deny standing to foster parents will actively discourage people from acting as foster parents because they are dissuaded from becoming involved in the child's future, particularly here, where the child is not to be returned home to his parents, but is removed from the foster home by another third party. It also discounts the inevitable emotional bond that develops between a family and a child and in no way promotes the goal of foster care. Indeed, fifty years ago, this Court recognized in Commonwealth ex rel. Children's Aid Society v. Gard, 362 Pa. 85, 66 A.2d 300 (1949) the inevitable psychological and emotional ties that attach between an infant and its care givers, regardless of biological connection:
A child of two years of age or under will form new attachments quickly if treated kindly by those into whose care it is given. In that respect it resembles a young tree whose roots have not yet taken deep hold in the nourishing earth, but when a child is much beyond the age of two years, it becomes strongly attached to those who stand in parental relationship to it and who have tenderly cared for it. Its bonds of affection have become so strong that to sunder them suddenly may result not only in the child's unhappiness, but also in its physical injury.

* * * * * *
Nothing could be more cruel than the forcible separation of a child from either its real or foster parents by whom it has been lovingly cared for and to whom it is bound by strong ties of affection; to a child it is equally cruel whether the separation is brought about by `kidnapping' or by legal process. In passing on the contested custody of children no judge can do justice without considering the human aspect of his problem.

* * * * * *

*139 [Agencies] ... which ... are entrusted by the sovereign with power over the lives of infants should ever bear in mind that consideration for the sensibilities of children and solicitude for their wellbeing is the hallmark of an (sic) humane individual and of a civilized state.
Id., at 97, 66 A.2d at 306.
It is imperative that we encourage caring, stable and competent foster parents, who are willing to care for abused and neglected children for an indefinite amount of time. I do not believe that we promote these relationships by making pronouncements that inhibit the foster families' ability to provide care for the child and to eviscerate their ability to challenge custody decisions, even where these decisions are not in the best interests of the children. Moreover, if we exclude foster parents from the hearing process, we needlessly leave out of our decisions an important source of information about the child, and in the end, it is the dependent child who suffers. After all, the children count here, not the agency. I believe that we gain nothing, and lose precious information by refusing foster parents standing.
Standing to sue simply ensures that a particular party has a sufficient stake in a controversy before the court to obtain a judicial resolution. It should not be a doctrine to close the court house doors on parties who have a real interest in the matter at hand. I believe that the Juvenile Act confers "standing," subject to traditional jurisprudential limits, for the agency, the grandparent, and the foster parents to file these petitions. See also Silfies v. Webster, 713 A.2d 639 (Pa.Super. 1998)(holding that party standing in loco parentis has standing to seek custody of child); McLaughlin v. Pernsley, 654 F.Supp. 1567 (E.D.Pa.1987)(Hannum J.), aff'd, 876 F.2d 308 (3d Cir.1989)(affirming that foster parents have standing under federal law to raise foster child's rights).
We should join the growing number of our sister jurisdictions who have conferred standing to be heard to foster parents in proceedings related to children that have been in their care. Some states, such as Delaware, Nebraska, South Carolina, and West Virginia have conferred standing to foster *140 parents via judicial decision. See In re C.M.D., 256 A.2d 266 (De.1969) (deciding that foster parents had standing to petition Family Court for custody of foster child); In re Jorius G., 249 Neb. 892, 546 N.W.2d 796 (1996) (finding that foster parents had standing to contest agency's removal of foster child); Greenville County Department of Social Services v. Bowes, 313 S.C. 188, 437 S.E.2d 107 (1993) (holding that foster parents have standing to intervene to seek termination of parental rights); In re Harley C., 203 W.Va. 594, 509 S.E.2d 875 (1998) (granting foster parents standing to intervene in parental rights hearing) (emphasis added). A number of other states, including New Jersey and Wisconsin, have enacted legislation that allows guardians, including foster parents, the right to object to a petition for adoption and to be heard in parental termination hearings. See, e.g., N.J. Stat. Ann. § 9:3-46(b) (West 1998) (requiring any person, who has provided primary care and supervision in his home for a period of six months, to be given notice of action and "standing to object" to adoption)(emphasis added). See also Wis. Stat. Ann. § § 48.42(2g), 48.90 (West 1998)(directing that court give foster parents notice of hearing for termination of parental rights and also allowing pre-adoptive parents to file petition for adoption) (emphasis added).
In reaching the conclusion that foster parents should have standing to file and contest custody petitions under the Juvenile Act, I do not ignore, as the Majority suggests, the statutory framework that governs foster care arrangements. Instead, it is simply my opinion that the statutory framework at issue  the Juvenile Act  unambiguously conveys to "any person," including foster parents, the right to file a petition concerning their foster children. This clear grant, in combination with the intricate relationship among the best interests of the child, the liberty rights of the foster parents, and traditional notions of standing, compel me to depart from the Majority's holding and to conclude that foster parents should have standing given the factual circumstance before us. Indeed, the very statutory language that the Majority cites in its opinion to support its conclusion that a foster parent's relationship is "subordinate" refers to an agency removing a child *141 from foster care only under "appropriate" circumstances. E.g., Crystal D.R., 331 Pa.Super. at 509, 480 A.2d at 1150. It seems clear to me that the "appropriateness" of removing a child from a foster home can only be made after gathering all relevant information about the foster home and by hearing from all parties involved, including the foster parents. Thus, logic dictates that foster parents should have standing and a right to be heard before the court where the court is deciding the "appropriateness" of removing a child from the home of that foster family. Moreover, I believe that when confronted with matters dealing with the custody of children, we can never lose sight of the fact that these provisions should always concentrate on the best interests of the child. To deny standing to foster parents does not promote this guiding principle.
Accordingly, I dissent.
Justice CASTILLE joins this Opinion In Support of Reversal.
NOTES
[1] While granting Appellants provisional standing, the trial court clearly concluded that, legally, Appellants did not have standing. The court noted:

I've been allowing the [Appellants] to maintain what I would perhaps characterize as temporary or unadjudicated standing  if I can use that word  in order to better develop the record..... The Court basically considers the foster parents in this proceeding more as a friend of the Court. However, as pointed out in the briefs, the issue I've been asked to consider is whether, in fact, they have true standing in the legal sense....
I do agree... legally that the foster parents do not at this point in time have standing.
N.T., September 13, 1994 at 31-34.
[2] Four judges voted to affirm the trial court's determination that Appellants lacked standing and four judges voted to reverse the trial court's finding. The trial court's order in this regard was therefore affirmed. The Superior Court then addressed the issue of whether the trial court's decision awarding physical custody to David Pursel was proper. Seven of the eight judges deciding the case concluded that there was insufficient evidence presented to the trial court to determine whether physical custody was properly awarded to Pursel. Accordingly, the Superior Court vacated the trial court's order and remanded for further hearings. We granted Appellant's petition for allowance of appeal to address the issue of whether Appellants lacked standing.

In the meantime, hearings on remand were conducted and, thereafter, the trial court held that "the best interest and welfare of the child" would be served by granting full physical and legal custody to David Pursel. N.T., March 25, 1996 at 226. Although not relevant to the outcome of this case, it should be noted that it was established at the remand hearings that the referral and listing of David Pursel as a child abuser had been "ultimately dismissed and ultimately expunged." Id. at 104.
Appellants attempted to appeal this order to the Superior Court, which, based on its prior decision, quashed the appeal for lack of standing. Again, Appellants petitioned this Court for allowance of appeal and we granted permission to appeal, consolidating Appellants' two appeals.
[3] Apparently, the dissent would favor ignoring the statutory framework set forth by the legislature regarding the limited role foster parents play in the lives of their foster children in analyzing whether they have standing to seek or contest custody proceedings. The dissent seems to advocate the view that the foster parent/child relationship, by its nature, gives foster parents a direct, substantial and immediate interest in such proceedings, However, given that the role of foster parents is exclusively defined through the legislative scheme, to ignore the same when determining their status in child custody proceedings, as advocated by the dissent, would be improper.
[4] When Stapleton was decided, the Juvenile Act was codified at 11 P.S. § 50-101 et seq. The Juvenile Act now appears at 42 Pa.C.S. §§ 6301-6355 and has not been materially changed.
[1] 42 Pa.C.S.A. § § 6301-6361 (1998).
[2] As set forth more fully in this Dissenting Opinion, I believe that Section 6351 allows "any person" to file a petition and thus, these foster parents had standing to initiate an action pursuant to the Juvenile Act. 42 Pa.C.S.A. § 6351. I note further that both the newly amended Juvenile Act and the Federal Adoption and Safe Families Act recognize that foster parents are to be given notice and hearing whenever a petition is filed to transfer custody of the foster child. 42 Pa.C.S.A. § 6336.1 (1998 Amendments); 42 U.S.C. § 671(a)(15), § 675 (amendments effective 1998). While these new amendments do not grant foster parents standing to file petitions, id., they also do not prohibit this Court from conferring such standing, based upon our traditional notions of standing to sue. Consequently, it is my opinion that the Juvenile Act and traditional jurisprudence confer upon foster parents both standing to file petitions pursuant to Section 6351 of the Juvenile Act, and an opportunity to be heard under Section 6336.1 of the Act, 1998 Amendments. While the Juvenile Act might make a distinction between "standing" and a right to be heard, there appears to be no relevant difference in the application of these concepts in circumstances like those presented here.
[3] See, e.g., Franklin Township v. Commonwealth Department of Environmental Resources, 500 Pa. 1, 452 A.2d 718 (1982). In Franklin, the Township and County of Fayette filed objections to a Department of Environmental Resources (DER) permit that was issued for a toxic waste landfill. Both the hearing board and Commonwealth Court dismissed the objections because of a lack of standing. We reversed and determined that the Township and County had standing to contest the permits because both parties had an interest, greater than the citizenry as a whole, in protecting the environment, and in protecting and promoting the life quality of all of its inhabitants. In determining that the Township and the County had standing, the majority rejected the notion that because the protection of the environmental interest was vested primarily in the state, through the DER, these parties did not have standing. In Franklin, we determined that maximum protection of public health could best be accomplished through the combined efforts of the citizenry and government. Cooperation between and among all who have an `interest' in the environment is essential to achieve the aims of minimal cost and maximum protection. Franklin, 452 A.2d at 721.

I find the legal reasoning and public policy determinations set forth in Franklin markedly similar to the overarching principles that confront us here. The purposes of social policy legislation are better served by allowing the Court to hear from all parties who have a real and direct interest in these types of claims.
[4] Section 2512(a) states as follows:

(a) Who may file  A Petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following
(1) Either parent when termination is sought with respect to the other parent.
(2) An agency.
(3) The individual having custody or standing in loco parentis to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt).
23 Pa.C.S.A. § 2512(a) (1998) (emphasis added).
[5] The Juvenile Act, unlike the Adoption Act, explicitly provides that "any person" may file a Petition. In fact, the Juvenile Act states that: A Petition, which shall be verified and may be on information and belief, may be brought by any person including a law enforcement officer. It shall set forth plainly:

(1) The facts which bring the child within the jurisdiction of the court and this chapter, with a statement that it is in the best interest of the child and the public that the proceeding be brought....
42 Pa.C.S.A. § 6334 (emphasis added).
[6] In Smith, unlike the situation in Crystal D.R. and here, the central issue before the Court was not a statutory interpretation of whether the foster parents had standing to sue under a specific statute. The foster parents in Smith were contesting the New York statute and regulations governing the removal of foster children from foster care as violating the foster family's due process rights. The United States Supreme Court's discussion, to which the Crystal D.R. court referred, focused on the foster parents' relationship to the state and the agency in the context of whether any liberty rights attached to the foster family relationship and whether the regulations violated those rights. The majority in Smith recognized that, even though a state-created relationship, the foster parents had some limited liberty interest in the foster family arrangement, both for themselves and for the foster child involved.
[7] In Clinton, the City of New York, health care providers, and others brought an action to contest the constitutionality of the Line Item Veto. The Supreme Court rejected the argument that the wrong parties brought suit because the State of New York had standing to sue. The Supreme Court noted that the pertinent analysis is whether the particular litigant has a sufficient stake in the action, not whether someone else also has standing or has a greater interest in the outcome of the suit. Id. at 2102.
[8] For example, the Federal Adoption Assistance and Safe Families Act of 1997 (1998 Amendments to the Social Security Act) focuses primarily upon the safety and well being of the child. This Act has veered away from requiring the states to promulgate regulations that attempt a reunification of the child with the family at all costs. 42 U.S.C. § 671(a)(15), § 675. While the Federal guidelines keep reunification as an important goal, the Act aims to speed up the adoption of foster children where reunification is not feasible by requiring more immediate permanency planning, including consideration of termination of parental rights. Id. The laws of most states, including the 1998 Amendments to Pennsylvania's juvenile and adoption statutes, now reflect this goal of speedier adoptions, with its emphasis on the welfare of the dependent child. The 1998 Pennsylvania Amendments continue to place as a primary objective the aim to "preserve the unity of the family whenever possible," 42 Pa.C.S.A. § 6301(b)(1) (1998 Amendments); however, the new Amendments allow the court to consider certain "aggravated circumstances," which would mitigate against returning the dependent child to the biological family. 42 Pa.C.S. §§ 6302, 6334 (1998 Amendments).

Legislation favoring more expeditious adoptions recognizes that many children in the foster care system can never be returned to their natural parents and spend years drifting from home to home. Such instability is emotionally harmful to the child. Thus, the shift of focus from one of reunification to one of permanency planning and adoption. See also Robert G. Schwartz, Looking Back, Looking Ahead: The Evolution of Children's Rights, 65 Temple L.Rev. 1557 (1995).