No. 24-176 – *In re M.B.*

TRUMP, Justice, concurring:

FILED

**November 13, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

I agree with the decision to affirm the circuit court's order, because it found that M.B.'s continued placement with his foster family served M.B.'s best interests in a number of ways. I write separately because I would have limited the scope of this Court's review, as well as the reasoning in the opinion, to the narrow issue before the circuit court in this case: whether continued placement with the foster parents, as a permanency plan for M.B., was consistent with his best interests. *See Napoleon S. v. Walker*, 217 W.Va. 254, 259, 617 S.E.2d 801, 806 (2005) ("A fundamental mandate, recognized consistently by this Court, is that the ultimate determination of child placement must be premised upon an analysis of the best interests of the child."); *State v. Michael M.*, 202 W. Va. 350, 358, 504 S.E.2d 177, 185 (1998) ("[A] circuit court must endeavor to secure for a child who has been removed from his or her family a permanent placement with the level of custody, care, commitment, nurturing and discipline that is consistent with the child's best interests."). Additionally, I would have found that the circuit court committed harmless error to the extent that the court's misapplication of the Supreme Court of the United States' holding in *Wisconsin v. Yoder* ("*Yoder*")[1] prevented it from considering whether any aspect of M.B.'s continued placement with the foster parents threatened his best interests.

---

[1] 406 U.S. 205 (1972).

1

In its order, the circuit court found that the foster parents would give the child a "stable loving home," that the placement would allow the child to "be placed with his biological siblings," and that he would "receive a basic education and . . . learn a trade." The circuit court made similar findings from the bench:

> I find that it is in [M.B.'s] best interest to remain in this placement. There are many reasons for that. This is a stable home. The foster parents love this child. . . . They've accepted [M.B. and his three sisters] and want to give these children a home and a family that [the foster father] said could last until eternity. I feel that these children are very fortunate to have foster parents who love them in that way. [M.B.] is in a home with his biological siblings and this is the only family that he has known for his entire life.

However, the circuit court also employed reasoning and relied upon authority that was not applicable in this case. Specifically, the circuit court made the following findings in its order, related to the foster parents' Amish faith, prior to engaging in its analysis of M.B.'s best interests:

> [] That the United States Supreme Court in Wisconsin v. Yoder, 406 U.S. 205 (1972) held that children in an Amish community are exempt from attending high school due to their religious beliefs.
> . . . .
> [] That, after considering all the above, the Court does not believe that it is appropriate to remove the child from this home.
> [] That the Court does not believe that it can discriminate against this family due to its religion and lifestyle.
> [] That the United States Supreme Court has given the Amish communities certain entitlements to protection.

The holding of *Yoder* has no relevance to this case. *Yoder* involved a constitutional challenge by Amish parents to Wisconsin's compulsory school attendance law, which

2

required all children to attend school until the age of sixteen in contravention of "the fundamental mode of life mandated by the Amish religion."[2] In holding that Wisconsin could not compel Amish parents to send their children to school beyond the eighth grade, the Supreme Court made clear that its decision was based on *the combination of* the parents' free exercise rights under the First Amendment to the United States Constitution ("free exercise rights") with the parents' due process rights under the Fourteenth Amendment to the United States Constitution ("parental due process rights").[3] Without this confluence, *Yoder* has no applicability.

The case before us does not involve parental due process rights. Rather, the circuit court was tasked with deciding whether M.B. should remain in a foster placement with his foster parents who, like the parents in *Yoder*, also happen to be Amish. The similarity between this case and *Yoder* ends there. *Yoder* involved a state's attempt to

---

[2] 406 U.S. at 217.

[3] 406 U.S. at 233-234 ("[W]hen the interests of parenthood *are combined* with a free exercise claim of the nature revealed by this record, more than merely a reasonable relation to some purpose within the competency of the State is required to sustain the validity of the State's requirement under the First Amendment. . . . For the reasons stated we hold . . . that the *First and Fourteenth Amendments* prevent the State from compelling respondents to cause their children to attend formal high school to age 16.") (emphasis added) (internal quotations and citations omitted). *See also Employment Division v. Smith*, 494 U.S. 872, 881-882 (1990) (explaining that, generally, cases in which the Court has upheld free exercise challenges to "neutral laws of general applicability" were "hybrid situations" involving "the Free Exercise Clause in conjunction with other constitutional protections, such as . . . the right of parents . . . to direct the education of their children") (citing *Yoder*).

3

regulate the choices that parents may make concerning *their own children's* education; the case in front of us does not. Like all persons, foster parents have free exercise rights under the First Amendment. However, foster parents do not have parental due process rights, such as the right "to direct the religious upbringing"[4] of foster children whom the State places in their care. Foster children remain in the legal custody of the DHS while they are in a foster placement,[5] and the rights and duties of the foster parents are contractually defined in an agreement between the foster parents and the DHS.[6] As such, *Yoder* should not have prevented the circuit court from objectively considering whether *any* aspect of M.B.'s foster placement was contrary to his best interests when rendering its decision. While the circuit court's misapplication of *Yoder* appears harmless in this particular case, this Court should have squarely addressed it, considering that the DHS asks this Court to

---

[4] *See* 406 U.S. at 233 (recognizing the "rights of parents to direct the religious upbringing of their children") (citing *Pierce v. Society of the Sisters* , 268 U.S. 510 (1925)). *See also Troxel v. Granville*, 530 U.S. 57, 66 (2000) ("[W]e have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children.") (internal citations omitted).

The Foster Parents Bill of Rights recognizes that there are limitations on a foster parent's ability to direct the religious upbringing of a foster child, providing that a foster parent has "[t]he right to maintain the parent's or parents' own family values and beliefs" only "so long as the values and beliefs of the child are not infringed upon[.]" W. Va. Code § 49-2-127(2) (2020). *Contrast* W. Va. Code § 49-12-4(2) (2025) (declaring, as part of the "Parents' Bill of Rights," the right of a parent "to direct the upbringing and the moral or religious training of his or her minor child."), with *id.*

[5] *See* W. Va. Code § 49-2-106 (2024).

[6] *See* W. Va. Code § 49-2-127a (2020).

4

extend the holding of *Yoder* to foster parents.[7] Such an expansive reading of *Yoder* threatens the primacy of the "best interests of the child" standard in abuse and neglect proceedings, as well as the objectives underlying our state's foster care system.

The primary goal of our state's foster care system is to provide foster children with temporary care in the least restrictive setting available while the DHS works toward family reunification.[8] When reunification is not possible, a foster placement may become a permanent placement option for a child, but only when the placement provides "the level of custody, care, commitment, nurturing and discipline that is consistent with the child's best interests." *See Michael M.*, 202 W. Va. at 358, 504 S.E.2d at 185. The overarching purpose of West Virginia's foster care system is to "serve the mental and physical welfare"

---

[7] Both the DHS and the State (as amicus) fail to acknowledge in their briefs that the Supreme Court applied strict scrutiny in *Yoder* based on *the combination of* the Amish parents' free exercise rights with their parental due process right to control the religious upbringing of *their own* children. *See supra,* n.3. Neither the DHS nor the State recognizes that *Yoder* provides no basis for imputing the due process rights of parents to direct the religious upbringing of *their own* children to foster parents who have contracted with the DHS to provide care for children in the legal custody of the State of West Virginia.

[8] *See* W. Va. Code § 49-4-604 (2020) (setting forth the hierarchy of dispositional preferences, which favors reunification when possible, and requiring the circuit court to consider whether the DHS has made reunification efforts prior to terminating parental rights). *See also State ex rel. C. H. v. Faircloth*, 240 W. Va. 729, 744, 815 S.E.2d 540, 555 (2018) (explaining that "it is in a child's best interests to be unified with his or her natural family if reasonably possible and [] foster parents serve a vital role in fulfilling that specific goal.") (citing *In re G.C.*, 558 Pa. 116, 735 A.2d 1226, 1229 (1999) ("[I]f possible, a child should grow up with its parents. . . . It is the foster parents' responsibility to help to achieve these purposes—not to subvert them.")).

and other best interests of children in DHS custody.[9] Accordingly, "the ultimate determination of child placement must be premised upon an analysis of the best interests of the child," not the interests, religious or otherwise, of foster parents wishing to adopt a child. *See Napoleon S.*, 217 W.Va. at 259, 617 S.E.2d at 806.

Ultimately, the circuit court acknowledged that "the most important thing to consider [was] the best interest of the child," undertook a careful analysis of M.B.'s best interests, and concluded that M.B. should remain in the foster parents' "stable loving home."[10] Based on this analysis, I agree that this Court should affirm the circuit court's decision. Nonetheless, I would have addressed the circuit court's misapplication of *Yoder* to make absolutely clear that neither the lower courts nor the DHS should ever subordinate the best interests of a foster child to the interests of foster parents—based on the foster parents' "free exercise rights" or any other factor—in an abuse and neglect proceeding.

---

[9] *See* W. Va. Code § 49-1-105 (2015).

[10] There was ample evidence to support the circuit court's conclusion. A Special Commissioner, appointed to evaluate the foster placement, observed that the home was "comfortable, pleasantly furnished, and spotless," that M.B.'s sisters were "well-behaved, beautifully dressed, clean, and obviously very attached to their parents," and that M.B. "appeared very clean and content." The Special Commissioner further found that "the family's personal interactions revealed a warm, caring, close, and respectful bond" and that if M.B. were to remain in that placement, he would "grow up in a loving and spiritual home with his three biological sisters," "learn valuable home and work skills," "learn to be a productive and independent citizen," and "be able to support himself and a family [as] part of a close and mutually-beneficial spiritual community."