

**J.F. v. D.B.**

C.P. of Erie County, no. 15061-2003.

*Melissa H. Shirey,* for plaintiff.
*Joseph P. Martone,* for defendant.

CONNELLY, *J.,* April 2, 2004—

## PROCEDURAL HISTORY

This unusual matter comes before the court primarily on the issue of standing for child custody. At the center of the custodial dispute are male triplets A, B and C, born to a surrogate mother not genetically related to them and a biological father whose sperm fertilized the three donor eggs that created them.[1]

On December 11, 2003, the plaintiff, biological father, J.F., filed a complaint for sole custody and motion for special relief. The Honorable John J. Trucilla issued an order granting temporary custody of the triplets to the defendant, surrogate mother, D.B. The order also provided five days a week visitation for the plaintiff and his companion E.D. The order specifically did not waive defendant's standing claims, which were to be heard later before this court. On December 16, 2003, defendant filed an answer with a counterclaim for custody. The following day, the Honorable Elizabeth K. Kelly cancelled that parties' scheduled custody conciliation sua sponte, awaiting this court's determination.

Hearings were held before this court on December 22, 2003 and March 11, 2004, solely on the issue of standing. Briefs and supplemental briefs were submitted to the court on December 29, 2003 and March 12, 2004, respectively.

---

1. Despite defendant's argument demanding proof of plaintiff's paternity, the court finds defendant to be bound by her previous pleadings acknowledging said paternity. See *Tregoning v. Wiltschek,* 782 A.2d 1001 (Pa. Super. 2001). Wife who sued former husband seeking custody of child was estopped from challenging husband's paternity because she had accepted paternity in past.

## FINDINGS OF FACT

Given the already complicated history of this case, a time line of the relevant facts is necessary. At the end of 2001, D.B., interested in the idea of being a surrogate mother, found and applied online to Surrogate Mothers Inc. (SMI), a private surrogacy agency based in Indiana.[2] SMI matched D.B. with J.F. and E.D., his paramour, to be a gestational surrogate. A gestational surrogate is a woman who carries implanted embryos, created by donor eggs fertilized by the biological father's sperm, in her womb until birth.[3]

In April 2002, D.B. and E.D. met for the first time. J.F. was not present for this meeting. During July and August 2002, J.F., D.B. and her husband, and the egg donor, J.R., signed and notarized a surrogacy contract drawn up by SMI director and attorney, Steven Litz.[4] At the end of 2002 and beginning of 2003, the parties underwent extensive medical and psychological testing.

---

2. *http://www.surrogatemothers.com/expense.html.*

3. "Adventures in Babysitting: Gestational Surrogate Mother Tort Liability," Karen A. Bussel, 41 Duke L.J. 661 (1991).

4. The court does not wish to forcibly include J.R., the egg donor, in this matter, after she has already declined to become involved. As the court views it, an egg donor should be likened to a sperm donor. Because egg donation is a newer medical process than sperm donation, most states have not passed legislation addressing it. However, both donors contribute genetic material to others in exchange for payment, signing away all biological, parental, and other legal rights to their contribution and any child they may help produce. The majority of egg and sperm donations are anonymous proceedings, with neither the donors nor the recipients knowing the other. The donors, by choice and often by contract, choose to be uninvolved in the lives of any children that may result from their donations. For these reasons, the court does not consider J.R. to be a party to this matter. See *Ferguson, infra.*

In April 2003, D.B. was implanted with three embryos in Cleveland, Ohio. J.F. and E.D. were present for this procedure. D.B.'s pregnancy was confirmed in May and shortly thereafter it was discovered that she was carrying triplets, with a tentative due date of December 3, 2003. Hearing testimony revealed this to be a very unusual situation because normally only one embryo may take, not all three.

From May to November 2003, D.B. attended doctor's visits every two weeks in Erie, Pennsylvania. J.F. and E.D. attended the first few visits until D.B.'s doctor asked them to stay in Cleveland. Per doctor's orders in June, D.B. quit her job to go on bed rest. From July to November, D.B. remained on bed rest. During this time, she requested that J.F. and E.D. pay her $1000 per month to cover her expenses, including housekeeping, a babysitter for her three children, and lost wages from quitting her job. J.F. and E.D. agreed and mailed checks of $500 to D.B.'s home address every two weeks. They, in particular E.D., also remained in frequent phone contact with D.B. about her condition.

In September 2003, Hamot Medical Center was informed via letter from SMI, that D.B., a surrogate mother, was choosing to give birth to triplets at their hospital and to make arrangements as needed. Hamot was also told to expect a court order accompanying the intended parents, J.F. and E.D. that would give them legal custody of the triplets after their birth. At that time, according to witness Paul Huckno, head of risk management at Hamot, the hospital had never dealt with a surrogate pregnancy before and had no specific policy in place governing such.

On Wednesday, November 19, 2003, at approximately 10 a.m., D.B. gave birth to triplets by C-section at Hamot. The babies were slightly premature at 35 weeks old and had some minor medical problems typical of their age. They were placed in the neonatal intensive care unit (NICU) under the care of doctors Jonathan and Michelle Kay Chai.[5]

J.F. and E.D. were called at 8 a.m. on November 19 to inform them that D.B. was in labor. They arrived at Hamot that night between 7 and 8 p.m. from Ohio, with no court order. Hamot staff then employed their normal procedure of allowing the birth mother to consent to any and all visitors. From her hospital bed, D.B. consented to J.F. and E.D. seeing the triplets. At that time, D.B. testified that she fully expected J.F. and E.D. to take care and custody of the triplets and she would return home without them.

The following days, November 20-24, E.D. maintained phone contact with Hamot NICU staff, checking on the triplets' condition and making appointments to visit them again that weekend. J.F. helped her complete legal and medical insurance paperwork and bought a mini-van with three car seats, as well as clothes, toys, and other things for the triplets.

On Saturday, November 22, D.B. was discharged from the hospital. She received a call from E.D. saying they were very "busy." E.D. made an appointment by phone with Dr. Jonathan Chai for November 22 to undergo sleep apnea monitor training for the triplets. The appointment

---

5. Doctors Chai are married and both employed in Hamot's NICU as staff neonatalogists. Both gave deposition testimony for this matter on February 2, 2004.

was cancelled the next day because two triplets were put on oxygen by Dr. Michelle Chai. Both Doctors Chai later testified that cancellation of the appointment did not bar J.F. and E.D. from visiting the triplets. Meanwhile, D.B. continued to receive updates on the triplets' progress from her mother, a Hamot employee, who would stop by to check on them.

On Monday, November 24, E.D. called Hamot and scheduled monitor training. E.D. also called D.B. and said she and J.F. visited the triplets that weekend. The next day, D.B. called Hamot NICU to check on the triplets and discovered that E.D. and J.F. never visited the triplets that weekend. D.B. then called SMI concerned about this information.

On Tuesday, November 25, E.D. called Hamot for an update and indicated that she and J.F. would arrive at the hospital that evening. The same day, D.B. returned to Hamot to meet with several staff members, including Dr. Michelle Chai, NICU nurses, and social workers, about the triplets and whether she could take them home herself. She expressed concerns about the lack of visits from the intended parents, the fact that no names had been selected for the triplets, and E.D.'s apparent lie about visiting them. At the conclusion of the meeting, D.B. revoked her consent for J.F. and E.D. to visit the triplets and prepared to take them home with her. According to the testimony at the hearing from various Hamot staff members, no one encouraged or convinced D.B. that she should take the triplets home. Rather, it appears to have been her own idea.

Hamot set up "nesting" with D.B., her husband, and the triplets for that night (November 25). Nesting allows

the parents or caretakers to care for their babies overnight, use the apnea sleep monitors, etc. as they would at home, but with hospital staff nearby to assist them with any problems and emergencies. D.B. and her husband also completed monitor training that day. D.B. did not call J.F. and E.D., testifying she assumed SMI would call them about her decision.

That evening, J.F. and E.D. arrived at Hamot and were met by security. They were informed that the triplets had been discharged to D.B.[6] Upon returning home to Ohio, E.D. called D.B. and left a message, asking, "What's going on?" E.D. and J.F. also received a message from SMI Director Steven Litz, informing them of D.B.'s decision. On Thursday, November 27, the triplets were officially discharged to D.B.

From November 27 to December 11, 2003, D.B. received two phone calls from J.F. and E.D., which she did not return because she was "upset" and "angry." J.F. and E.D. did not attempt to visit the triplets, claiming they did not know where they were until the December 11 court hearing before Judge Trucilla.

According to D.B.'s testimony at the hearing, J.F. and E.D. have only visited the triplets at D.B.'s residence two or three times a week, often at inconvenient times, instead of the allowed five visits per week. J.F. and E.D. testified that D.B. often cuts their visits short. D.B. also testified when J.F. and E.D. take the triplets with them, they often return them in soiled clothing and dirty diapers; E.D. often insists on feeding them, even when they have just been fed; and J.F. often sits silently or watches

---

6. They weren't discharged with D.B. that day. Paul Huckno testified that this was told to J.F. and E.D. for "safety reasons."

television, and once even fell asleep. D.B. further testified about increasing tension and conflicts between herself, her husband, and J.F. and E.D. whenever they visit. J.F. and E.D. maintain that they still intend to be parents to the triplets. The matter is now before the court.

## CONCLUSIONS OF LAW

For purposes of better understanding of the terms involved in this case, the court defines the following:[7]

*Gestational surrogate/carrier*—A woman who carries a fetus not genetically related to her for the purpose of delivering it to the intended parents. The embryo carried is created by either the intended father's sperm or donated sperm fertilizing either the intended mother's harvested egg or a donor egg. The resulting embryo is implanted through in vitro fertilization into the surrogate's womb where it gestates until birth.

*Biological/genetic parent*—A person who shares a genetic connection to a child. They are the contributor of genetic material that creates a child. Some biological/genetic parents do not assume custody and/or parental duties for that child (*i.e.* a biological parent who gives up child for adoption at birth).

*Intended parent(s)*—A person (or couple) who intends to take custody of and assume all parental rights and responsibilities to a child born via surrogacy, given up for adoption, etc. Some intended parents may be genetically related to the child through sperm or egg donation.

---

7. From Black's Law Dictionary, 1990 ed., *http://www.surrogacy.com/legals/article/checklist/chklst1.html.*

*Surrogate parenting agreement*—A contract between a surrogate mother and intended parent(s) which manages the surrogacy arrangement, including legal, financial, medical, documentary, etc. details. Some surrogate parenting agreements allow fees for the surrogate mother, if not prohibited by state law. Private agencies and attorneys may draw up the agreements while some states require a court to approve them.

*Parent*—The lawful father or mother of a person. Includes anyone entitled to take under a child's estate, natural parents, adoptive parents, illegitimate parents, or any individual or agency acting as child's guardian.

*Mother*—A woman who has borne a child, includes maternity during pre-birth period.

*Egg donor or sperm donor*—A person who donates genetic material (female donates eggs, male donates sperm) usually for a fee to help others have children. Donors are often anonymous and usually give up any parental rights they may have to a child they may help create.

### I. *Surrogacy Law in Pennsylvania*[8]

With these terms in mind, the court now turns to the issue at bar—whether a gestational surrogate like D.B. has standing to pursue a custody action against a biological parent like J.F. The only case in Pennsylvania to address a surrogate mother's standing is *Huddleston v. Infertility Center of America Inc.,* 700 A.2d 453 (Pa.

---

8. "Surrogacy and the Law of Pennsylvania," by Lawrence A. Kalikow, Esq., April 1999.

Super. 1997), a negligence and wrongful death case, but it is barely on point.

In *Huddleston,* a surrogate mother entered into a surrogate parenting agreement with a biological father, a single man. A month after birth, the child died as a result of the biological father's abuse. The surrogate mother filed suit against the fertility clinic that had arranged the surrogacy, alleging that the clinic's negligence in choosing the biological father caused the wrongful death of the child. The trial court found that the surrogate mother had no standing because she was not the child's legal parent. On appeal, the Superior Court found that the surrogate mother had standing, mostly because no one had challenged her standing to seek letters of administration for the child's estate. Further, the court found that the biological father's abusive actions were foreseeable and that the clinic had a duty of care to screen its surrogacy applicants for potential negative characteristics.

Since no Pennsylvania cases relating to surrogacy existed at that time, the *Huddleston* court relied on a Sixth Circuit case, *Stiver v. Parker,* 975 F.2d 261 (1992), which held a surrogacy agency liable for allowing surrogate mother to be infected by biological father's untested semen. The court determined that the agency had a "special relationship" with the surrogate mother and a duty of care to reduce harm to her and the child she carried.

However, *Stiver* is no more on point to the case at bar than *Huddleston.* As the trial court in *Huddleston* stated, "[T]he absence of judicial precedence, and . . . legislative offerings, point out that there is no articulated fixed policy on many surrogacy issues in Pennsylvania at this

time." *Huddleston v. Infertility Center of America Inc.*, 31 D.&C.4th 128, 144 (1996).

This court is inclined to agree. Its own research has revealed very little stated policy regarding surrogacy in Pennsylvania. The last proposed surrogacy legislation was in 1997, H.B. 527 P.N. 590, a bill introduced in the House.[9] H.B. 527 proposed legalizing surrogate parenting agreements with court review and approval. If the parties did not seek court approval, a fine of up to $20,000 could be imposed and any agreement made would be null and void. The bill also required criminal background checks and extensive medical and psychological testing for all parties involved. Upon birth of the child/children, the surrogate mother's parental rights would terminate immediately and the intended parents would take full legal custody. If, for any reason, prior to the birth the surrogate parenting agreement was terminated, written notice would be given to the court and the surrogate mother would become the legal mother of the child/children. Unfortunately, H.B. 527 succumbed to the fate of several predecessors and died in judiciary committee.[10]

While it is premature to say that the Pennsylvania Legislature intended that a surrogate mother have legal custody in situations where there is no surrogacy contract or where it has been declared void, the possibility has at least been considered by the legislature and the court takes that into minor consideration in issuing its decision. Without an actual surrogacy statute in place

---

9. *http://www.legis.state.pa.us/search/billsearch.idq.*

10. Bills in favor and against surrogacy were also proposed in 1987, 1991, and 1995. None of them survived the judiciary committee. No bill relating to surrogacy is currently before the legislature.

however, the court can only strongly urge the legislature to address the issue as soon as possible to prevent more complicated cases such as the one at bar.

## II. *Surrogacy Laws in Other States*[11]

Since this is a case of first impression in Pennsylvania, the court must look to the decisions rendered in sister states. In general, 31 states have either some type of surrogacy statute or case law setting forth the legality or illegality of surrogate parenting arrangements. Nineteen states, including Pennsylvania, are generally silent about surrogacy or do not have surrogacy laws or cases yet.

Sixteen of those 31 states have made surrogacy itself or surrogacy contracts illegal. Those states that make surrogacy (*e.g.* paid surrogacy or baby selling) expressly illegal are Delaware, Iowa, Michigan, New Mexico, New York, Oregon, Utah, Washington D.C. and Wisconsin. Surrogacy is exempt from criminal baby selling statutes in Iowa, Alabama and Washington. Those states that ban surrogacy contracts are Arizona, Connecticut, Indiana, Louisiana, New Jersey, North Dakota and Tennessee. Despite the fact that paid surrogacy contracts are illegal in New Jersey, free surrogacy volunteers (usually family members) are permitted.[12]

Seven states generally allow surrogacy, with or without a contract, fees, etc. They are Arkansas, California, Hawaii, Illinois, Massachusetts, Ohio and West Virginia.

---

11. *http://www.surrogacy.com/legals/states.html, http://www.surrogacy.com/legals/map.html.*

12. "Reproductive Surrogacy at the Millennium: Proposed Model Legislation Regulating 'Non-Traditional' Gestational Surrogacy Contracts," James J. Dalessio, 31 McGeorge L. Rev. 673, 2000.

Two of them, Massachusetts and California, require pre-birth orders that terminate the surrogate mother's parental rights and give custody to the intended parents. Illinois allows all "parents" to be listed on birth certificate, including the surrogate mother or gestational surrogate, the intended parents, the biological parents, and/or sperm and egg donors.

Florida, New Hampshire, Virginia and Arkansas allow surrogacy contracts and mothers, with the first three states requiring that the intended mother be infertile. New Hampshire and Virginia courts review and approve surrogacy contracts while the Arkansas statute presumes a child born to a surrogate mother to be the child of the intended parents, not the surrogate mother.[13]

California appears to be the state with the most surrogacy procedures, cases, and clinics.[14] It also appears to have some of the most complicated surrogacy case law and statutes. Generally, a surrogacy arrangement requires a contract between the parties prior to any medical procedures being performed. Then the intended parents must obtain a judgment of maternity and paternity prior to the child's birth. This judgment makes the intended parents the legal custodial parents. The surrogate mother, with or without a contract, is not the legal mother in California.[15]

Such contracts are not barred by public policy as held in *Johnson v. Calvert,* 5 Cal. 4th 84, 851 P.2d 776, 19

13. *Id.*

14. *http://www.everythingsurrogacy.com/cgi-bin/main.cgi?agencies#CA,* a list of California surrogacy clinics and associated law firms.

15. "Thomas Pinkerton: The San Diego Surrogacy Case" Transcript of chat with CNN.com on August 15, 2001. Pinkerton is a surrogacy attorney who practices in California.

Cal. Rptr. 2d 494 (1993). In that case, the court ruled that the genetic parents were determined to be the natural, intended parents of the gestated child. The parties' intentions were foremost in determining who would have legal custody of a child conceived by surrogacy. This "intent test" continues to be followed in California and by other states, including Pennsylvania's neighbor, Ohio. See *Belsito v. Clark*, 644 N.E.2d 760 (1994), where a common pleas court determined those with genetic ties to a child conceived by surrogacy were the intended parents.

The Connecticut Supreme Court in *Doe v. Doe*, 244 Conn. 403, 710 A.2d 1297 (1998), granted a custody trial concerning a child conceived by surrogacy and related biologically only to the father/husband. The court decided to treat the wife as a third party with standing (the surrogate mother and egg donor had terminated their rights). Ultimately, the court determined that the best interests of the children would control, no matter the legal standing of the parties.

In Massachusetts, the case of *R.R. v. M.H.*, 426 Mass. 501, 689 N.E.2d 790 (1998), set forth a requirement of three or more days for a surrogate mother to decide whether to terminate her parental rights, a time period similar to the state's adoption process. The Massachusetts Supreme Court found the surrogacy contract to be unenforceable because the surrogate mother received a fee for her services, which was against state public policy. The court expressed a preference for court-approved surrogacy contracts, or at the very least, some type of surrogacy statute passed by the legislature:

"We recognize that there is nothing inherently unlawful in an arrangement by which an informed woman agrees to attempt to conceive artificially and give birth to a child whose father would be the husband of an infertile wife. We suspect that many such arrangements are made and carried out without disagreement . . . . The mother and father may not, however, make a binding best-interests-of-the-child determination by private agreement. Any custody agreement is subject to a judicial determination of custody based on the best interests of the child . . . . A surrogacy agreement judicially approved before conception may be a better procedure . . . . *A Massachusetts statute concerning surrogacy agreements, pro or con, would provide guidance to judges, lawyers, infertile couples interested in surrogate parenthood, and prospective surrogate mothers.*" At 512-13. (emphasis added)

In a Massachusetts case addressing the custody of frozen embryos, the court in *A.Z. v. B.Z.,* 431 Mass. 150, 725 N.E.2d 1051 (2000), remarked:

"We glean from . . . statutes and judicial decisions that prior agreements to enter into familial relationships (marriage or parenthood) should not be enforced against individuals who subsequently reconsider their decisions. This enhances the 'freedom of personal choice in matters of marriage and family life. We derive from existing state laws and judicial precedent a public policy in this Commonwealth that individuals shall not be compelled to enter into intimate family relationships, and that the law shall not be used as a mechanism for forcing such relationships when they are not desired. This policy is grounded in the notion that respect for liberty and pri-

vacy requires that individuals be accorded the freedom to decide whether to enter into a family relationship.' " At 162. (citations omitted)

A New Jersey case, *J.B. v. M.B.,* 751 A.2d 613 (2000), similarly decided that a contract to procreate is against state public policy and agreements entering into or terminating family relations should not be enforced against unwilling parties. New Jersey is also home to the infamous *In re Baby M,* 109 N.J. 396, 537 A.2d 1227 (1988), case, which caused many states to either criminalize or regulate surrogacy. Since the surrogate was genetically related to the child she gave birth to, the *Baby M* case is not on point to the case at bar.

Based on the above cases, it appears to this court that the best way to address this matter is in terms of contract law and public policy.

### III. *Legality of the Surrogacy Contract*

While the court is encouraged by several states' approach to surrogacy via contract law regulation, it is keenly aware that there is no Pennsylvania statute in place yet. Still, the court is inclined to look at the surrogacy contract entered into during July and August 2002 that started this entire sequence of events. (Plaintiff's exhibit B.)

The parties to the contract are the plaintiffs, J.F. and his paramour E.D.; the defendant, D.B., and her husband; J.R., the egg donor; SMI and its director/attorney, Steven Litz. The court again notes that J.R. is not considered a party to this action, despite the fact that the contract refers to her together with D.B. The court reviews some of the more interesting sections of the contract as follows:

*Section 3* of the contract informs D.B. in capital letters that she is not consenting to termination of her parental rights or adoption at that time, just her intention to do so after the children are born.

*Section 9* states biological father's obligations, except those required by law of a biological parent, will cease if the surrogate mother, D.B., refuses to abort or selectively reduce any of the fetuses she carries at J.F.'s request. The section does not state who would then take legal custody of the children once they were born.

*Section 15* provides in the event that custody is awarded to surrogate mother, the other parties are indemnified and should be reimbursed any monies paid to the surrogate mother.

*Section 20* states that the biological father, J.F., is legally responsible for the children, even if they have abnormalities, unless a paternity test reveals that the children are not J.F.'s. There is no provision providing for a legally responsible mother or other co-parent, especially if the children are not his.

*Section 21* is where J.F. names E.D. to be his successor should something happen to him, but the space for a successor to E.D. is left blank. Again, there is no provision for whom takes custody of the children then.

The *Release and hold harmless agreement,* the last pages of the contract, appears to bar D.B. and her husband from seeking custody of the children. (Plaintiff's exhibit B, p. 9, ¶1.) It reads in relevant part: "Upon the birth of the child, Surrogate and/or E.D. [egg donor] *will surrender any custody rights to the child to the biological father* [biological father] whose identity (unless oth-

erwise agreed upon) I/we may never know." [emphasis added]

These contractual inconsistencies and the failure to name a legal mother for these children greatly trouble the court. Section 3 and the Release and hold harmless agreement contradict each other when D.B. agrees that she *intends* to terminate her rights and then agrees that she *will* surrender her rights. Sections 9 and 20, 20 and 21, 15 and 20, and 9 and 20 are in conflict with each other in that section 20 says J.F. will be legally responsible for the children but the other sections undermine that responsibility by allowing it to "cease" or be "indemnified." At no time does the contract state who the legal mother of the children shall be, particularly if something were to happen to J.F. and E.D., or if they were to decide not to take custody of the children.

Pennsylvania has traditionally recognized that a child has two legal parents, usually a mother and father. According to the aforementioned definition of "parent," it includes anyone entitled to take under a child's estate, natural parents, adoptive parents, illegitimate parents, or any individual or agency acting as a child's guardian. In some circumstances, there may only be one legal parent (*i.e.* death or abandonment). However, there cannot be three legal parents. See *Beltran v. Piersody,* 748 A.2d 715 (Pa. Super. 2000), dissenting opinion by Olszewski, J.:

"I also note that it is impossible for J.P. to have three parents. While a child may have two mothers or two fathers, see *J.A.L. v. E.P.H.,* 453 Pa. Super. 78, 682 A.2d 1314 (1996) (parties by their conduct created a parent-like relationship between appellee's homosexual part-

ner and her biological child, thus giving partner standing to seek custody), he cannot have two fathers and one mother. See *Michael H.,* 491 U.S. at 130-31, 109 S.Ct. 2333 (stating that 'multiple fatherhood has no support in the history or traditions of this country'). Until our legislature recognizes a different structure to the basic family unit, J.P. has two parents—Piersody and Mother." *Beltran* at 72 n.3.

Thus, J.F., E.D. and D.B. cannot all be parents simultaneously. Since E.D. is not actually a plaintiff/party to this action nor is she related to the triplets, the court excludes her from consideration.

Children should be able to identify who their parents are, even if they are not biologically or genetically connected to them. As the court in *J.C. v. J.S.,* 826 A.2d 1 (Pa. Super. 2003), recently held:

"Estoppel in paternity actions is merely the *legal determination* that because of a *person's conduct* (*e.g.,* holding out the child as his own, or supporting the child) that person, *regardless of his true biological status, will not be permitted to deny parentage* . . . . [T]he doctrine of estoppel in paternity actions is *aimed at 'achieving fairness as between the parents by holding them, both mother and father, to their prior conduct regarding paternity of the child.'*

"*Warfield v. Warfield,* 815 A.2d 1073, ¶8 (Pa. Super. 2003) (quoting *Fish v. Behers,* 559 Pa. 523, 741 A.2d 721, 723 (1999)). Moreover,

"Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the

potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father.

"*Hamilton v. Hamilton,* 795 A.2d 403, 405 (Pa. Super. 2002) (quoting *Fish,* 741 A.2d at 724)." At 3-4, (emphasis added) See also, *DiPaolo v. Cugini,* 811 A.2d 1053 (Pa. Super. 2002) (Hudock, J., dissenting) and *Bahl v. Lambert Farms Inc.,* 572 Pa. 675, 819 A.2d 534, 539 (2003) ("Such estoppel 'is based on the public policy that children should be secure in knowing who their parents are,' *Brinkley v. King,* 549 Pa. 241, 701 A.2d 176, 180 (1997), and, as such, it is designed to protect the best interests of minor children.").

There is no maternity by estoppel doctrine nor is there any legal definition of maternity, both of which might be suitable for this case since no legal mother has been named for the triplets. The court theorizes that if the doctrine of paternity by estoppel is based on the public policy that a child should know its father, then a doctrine of maternity by estoppel would be based on the corresponding public policy that a child should know its mother as well.

Moving on, a contract is void if it is used to bargain away rights belonging to children. See *Sams v. Sams,* 808 A.2d 206 (Pa. Super. 2002) (Father/NFL player could not compel his ex-wife/mother to contract away his child support obligation. The court found the agreement to reduce the child support amount was unconscionable, reducing father's obligation from $3,400/month to $1,000/month.), *Kesler v. Weniger,* 744 A.2d 794, 796 (Pa. Super. 2000) (Biological father and biological mother had long-standing agreement that if she became

pregnant, she would not seek any child support from him was void. "It matters not when an agreement to forego support occurred; the right to support is a right of the child, not the mother or father. It cannot be bargained away before conception any more than it can be bargained away after birth, nor can it be extinguished by principles of estoppel."), and *Ferguson v. McKiernan,* 60 D.&C.4th 353 (Dauphin Cty. 2002) (Court voided an oral contract between the parties where biological mother would release biological father from his child support obligation if he secretly volunteered to be her sperm donor.).

The contract in the case at bar did precisely the same as the parties attempted in *Sams, Kesler* and *Ferguson,* to sign away the rights of the triplets. The court therefore declares the surrogacy contract entered into by the parties to be void as against public policy because it does not provide for a legal mother for the triplets and it allows the parties to bargain away the children's custody and support rights. A contract is unenforceable if its formation or performance is criminal, tortious, or otherwise opposed to public policy. *Espenshade v. Espenshade,* 729 A.2d 1239 (Pa. Super. 1999). Courts should not override private contracts unless their terms offend public policy. *McIlvaine Trucking Inc. v. W.C.A.B. (States),* 570 Pa. 662, 810 A.2d 1280 (2002).

The contract allowed D.B. to sign away her custodial rights without a time period to consider them or a court hearing to address them. That is against Pennsylvania public policy and the contract should not be enforced against her. The decision in *Prudential Property and Casualty Insurance Co. v. Colbert,* 572 Pa. 82, 813 A.2d

747 (2002), explained the concept of contracts and public policy this way:

"Generally, courts must give plain meaning to a clear and unambiguous contract provision unless to do so would be contrary to a clearly expressed public policy. . . .

"Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy . . . . Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, [a c]ourt should not assume to declare contracts . . . contrary to public policy. The courts must be content to await legislative action." At 82-83, 813 A.2d at 750, 752.

In the present case, the court cannot wait for legislative action. But, it can look to the state tradition and public policy regarding children having two parents. Enforcement of a contract will be denied only if it conflicts with the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the particular term. *City of Wilkes-Barre v. City of Wilkes-Barre Police Benevolent Ass'n,* 814 A.2d 285 (Pa. Commw. 2002).

A, B and C did not hatch, they were born. They can only identify their father in the contract as J.F., but they cannot identify their mother so easily. It cannot be J.R.,

the egg donor, because she is not a party to this action. It cannot be E.D. who is not genetically related to them, nor is she even married to J.F. She has contributed nothing more than her presence and her interest in the triplets. That leaves D.B., who like E.D. is not genetically related to the triplets, but carried them in her womb and then gave birth to them. Her every decision prior to their birth has affected them—health, nutrition, prenatal care, etc. In addition, she has not terminated any parental rights she may have to the triplets. She has instead taken the triplets into her home and cared for them along with her three other children. She is more a mother and a parent by her actions than by genetics. She has assumed "maternity" if there were such a legal definition as there exists for "paternity." Since the contract is void because it does not provide for a legal mother, the court finds D.B. to be the legal mother of the triplets since she carried and bore them and has taken care of them as a natural parent would.

## IV. *Standing In Loco Parentis*

Even if this court did not determine that D.B. is the legal mother of the triplets, she would most likely still have third-party standing in loco parentis. Black's Law Dictionary defines in loco parentis to be, literally, "in place of parent." [16] It is also a legal doctrine that allows a person who assumes the duties and rights of a natural parent to have temporary standing in parental matters, such as custody and support, in absence of legal proceedings. [17] Given D.B.'s unusual situation as a gesta-

---

16. Black's Law Dictionary, 1990 ed.
17. *Id.*

tional surrogate with no genetic tie to A, B, and C, and her previous intentions to give them to J.F. and E.D., she does not neatly fit into any particular category of third party that has tried to claim custodial standing in loco parentis.

## Foster Parents

D.B. is like foster parents in that she has no genetic tie to the triplets but has volunteered to take care of them. She is not like foster parents because the state or government agency that places foster children stands in loco parentis, not the foster parents. In addition, SMI, the agency that arranged the surrogacy, is a private agency, not a governmental one. See *In the Interest of N.S., K.G., and P.A.,* 2004 Pa. Super 65, and *In re G.C.,* 558 Pa. 116, 735 A.2d 1226 (1999) (Foster parents acting as de facto parents do not have in loco parentis standing because the foster care agency has relationship with child, not the foster parents.).

## Relatives

D.B. might be considered a non-blood related relative to the triplets, like an aunt or uncle or half sibling. See *D.N. v. V.B.,* 814 A.2d 750 (Pa. Super. 2002) (half-sibling had no standing to pursue custody of her younger siblings), *Larson v. Diveglia,* 549 Pa. 118, 700 A.2d 931 (1997) (uncle who lived with and supported child could not bring child support action against biological father when only his wife, the child's aunt, had legal custody), and *Jackson v. Garland,* 424 Pa. Super. 378, 622 A.2d 969 (1993), and *Butler v. Illes,* 747 A.2d 943 (Pa. Super.

2000) (no standing for aunts because no statute provides for it, unlike grandparents).

All these relatives have been held not to stand in loco parentis to children in their care mostly due to a "void in the law." *Jackson, supra*. A surrogate mother like D.B. may also fall into that void if she is not declared to be a legal mother. Grandparents and great-grandparents have standing under the Grandparents Visitation Act, 23 Pa.C.S. §5301 et seq., but that is balanced against the best interests of the children. See *In re Adoption of D.M.H.*, 452 Pa. Super. 340, 682 A.2d 315 (1996), where court awarded custody to adoptive parents who were better for child's welfare than the biological grandmother.

## Stepparents and Same Sex Parents

D.B. is much more like a stepparent or a same sex parent, taking into account her lack of genetic tie and her voluntary care of the triplets. In *Parton v. Parton,* 36 D.&C.4th 241 (Monroe Cty. 1996), the court granted a stepfather partial custody in loco parentis based on his good relationship with his stepsons. He met the preponderance of evidence burden of proof by showing that he was doing all the things a parent would do, including feeding, bathing, playing and disciplining his stepsons. In *Liebner v. Simcox,* 834 A.2d 606, 610 (Pa. Super. 2003) another stepfather was granted standing in loco parentis because he provided a "family setting [for the child], irrespective of . . . traditional or nontraditional composition." The nature of the relationship between parents has no legal significance for in loco parentis standing. *T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913 (2001), and children are not to be treated as the offspring of the biological

single parent only. *J.A.L. v. E.P.H.,* 453 Pa. Super. 78, 682 A.2d 1314 (1996). Thus, despite the unusualness of a surrogacy arrangement, J.F. cannot claim to be the sole parent of the triplets. D.B., through her actions, has clearly shown that she is "doing all things a parent would do" and as a surrogate mother has and is creating a non-traditional family setting.

The court also notes a "void in the law" for surrogate mother standing. As the court in *L.S.K. v. H.A.N.,* 813 A.2d 872 (Pa. Super. 2002) (emphasis in original), said, "We recognize this is a matter which is better addressed by the legislature rather than the courts. However, in the absence of legislative mandates, the courts must construct a fair, workable and responsible basis for the protection of children, aside from whatever rights the adults may have *vis-à-vis* each other."

D.B. has assumed parental duties when she could have simply taken her surrogacy fee and walked away. She was not legally obligated to provide care or child support, yet she took on those responsibilities willingly and voluntarily. She and her husband went through monitor training and car seat testing and overnight nesting with the triplets. They continue to care for the triplets plus three other children in their home. It does not appear to the court that D.B. was pressured or talked into bringing the triplets home with her or that she is unable to handle the responsibility of being a legal mother to A, B and C.

## V. *Parental Duties and Wishes*

The court disagrees with plaintiff's argument that D.B. acted in defiance of J.F.'s wishes by taking the triplets home with her and thus should not be granted standing

in loco parentis because J.F., as biological father, does not approve. See *B.A. v. E.E. ex rel C.E.*, 559 Pa. 545, 741 A.2d 1227 (1999). The court would point out the unfortunate reality that many custody decisions are made where one party/parent does not approve of the other's actions and decisions, but must acquiesce because a court has allowed it.

Claims of parenthood and parental disagreement are not enough to defeat standing. As the court in *Cardamone v. Elshoff*, 442 Pa. Super. 263, 659 A.2d 575 (1995), stated:

"In Pennsylvania, there are three types of custody disputes: parent versus parent; parent(s) versus state; and parent(s) versus third party. . . . Persons other than natural or biological parents are deemed to be 'third parties' for purposes of custody disputes. . . .

"[Factors other than parenthood may] have significant impact on the well-being of the child [and] can justify a finding in favor of the non-parent, even though the parent has not been shown to have been unfit. . . .

"[P]arenthood alone is insufficient to defeat a custody claim raised by a non-parent. The most important issues in a custody dispute are the child's physical, intellectual, moral, and spiritual well-being." At 272, 273, 274, 659 A.2d at 579-80. (citations omitted)

In the case at bar and prior to this court's determination of D.B.'s legal parental status, D.B. is a third party seeking custody against J.F., the biological father of the triplets. As *Cardamone* held, his claim of parenthood alone is not enough to defeat D.B.'s counterclaim for custody. The court may consider the triplets' present well-being as well as their future welfare. See *Commonwealth*

*ex rel. Bloomfield v. Faxstein,* 84 Pa. Super. 243 (1924), where it would be contrary to the permanent well-being of the child to give its parents the custody, the parents' natural right must give way, and *Commonwealth ex rel. Rockey v. Hoffman,* 91 Pa. Super. 213 (1927), where parent's right to custody of infant child must be yielded, if child's welfare will be more secure elsewhere.

The court heard the testimony of D.B. as to her care of the triplets as well as their condition upon their return from visits with J.F. and E.D., and found her to be credible. Even discounting her testimony, the court also heard testimony from various Hamot medical staff and read their reports regarding the lack of visits from the intended parents and their behavior when they did visit (*i.e.* arriving late or canceling appointments, the delay in monitor training, nursing staff repeatedly telling E.D. to be quiet or calm down in the NICU). This is more than enough to cause the court some concern regarding J.F. and E.D. and the fulfillment of their parental duties.

As in the case *In re C.M.S.,* 832 A.2d 457 (Pa. Super. 2003), the biological father argued that since he was not aware of the child's whereabouts, he had no recourse but to wait for the adoption papers. The court determined that the father failed to take any action to overcome the obstacles to assert his parental rights. *C.M.S.* relied on the Pennsylvania Supreme Court's decision in *In re Burns,* 474 Pa. 615, 624-25, 379 A.2d 535, 540 (1977), in making its determination. *Burns* set forth what parental duties should include:

"*Parental duty* is best understood in relation to the needs of a child. . . . These needs, physical and emotional, *cannot be met by a merely passive interest in the*

*development of the child.* Thus, this court has held that the parental obligation is a positive duty which *requires affirmative performance.*

"This affirmative duty *encompasses more than a financial obligation;* it requires *continuing interest* in the child and a *genuine effort* to maintain communication and association with the child.

"[A] child needs *more than a benefactor* . . . .

"A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent *must use all available resources to preserve the parental relationship* and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child relationship. *In re Shives,* 363 Pa. Super. 225, 525 A.2d 801, 803 (1987). This court has repeatedly recognized that '*parental rights are not preserved . . . by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs.*' *In re Adoption of Godzak,* 719 A.2d 365, 368 (Pa. Super. 1998) (citation omitted)." *In re C.M.S.* at 462. (emphasis added)

It is obvious from J.F. and E.D.'s testimony that they have an interest in the triplets. J.F. vowed at one hearing to fight for custody "all the way to the United States Supreme Court." But, their testimony and actions, or rather inactions, belie their professed intentions for these children. They have provided financial support and insurance and amenities that children need, but they have not named the children, have not visited them with regular frequency, did not buy and prepare things for the trip-

lets *prior* to their birth nor make insurance arrangements, schedule monitor and car seat training, etc. with Hamot in a timely manner. They have not shown this court that they exerted themselves to maintain a parent-child relationship with the triplets, such as going to court as soon as D.B. took triplets home against their wishes, or exercised reasonable firmness in overcoming obstacles, like locating D.B.'s home to visit the triplets or speak with her in person. Even after they obtained a court order allowing them visitation five days a week, they have not fully utilized it. See also, *C.T.D. v. N.E.E. and M.C.E.,* 439 Pa. Super. 58, 653 A.2d 28 (1995) (Delay is arguable abandonment and failure to perform parental duties).

If plaintiff's counsel is correct that D.B. has custody of the triplets in defiance of J.F.'s wishes, then the court wonders why J.F. and E.D. have not appealed Judge Trucilla's order. The court also notes that Hamot has never received a court order from J.F. and E.D. allowing them legal access and custody of the triplets. All available resources, including all legal procedures, have not been used by J.F. and E.D. to preserve their parental relationship with the triplets.

Further, in light of E.D.'s little white lies to D.B. and Hamot staff as well as the incredible claim that J.F. and E.D. could not locate D.B. despite mailing checks to her home several months beforehand, the court does not find J.F. and E.D. to be fully believable. Their testimony often appeared to be self-serving and full of excuses, none of which the court is inclined to believe.

## CONCLUSION

It is the finding of this court that D.B. is the legal mother of the triplets, A, B and C, due to the fact that no legal mother was provided for in the surrogacy contract. Because the contract encouraged parties to sign away certain legal rights belonging to the triplets, the court finds it to be unconscionable. Thus, the contract is void as against Pennsylvania public policy.

Aside from the court's determination that D.B. is the legal mother of the triplets and therefore has automatic standing, the court also finds that D.B. has standing in loco parentis to pursue both custody and child support for the triplets. As biological father, J.F. has a legal duty to provide child support even if he disagrees with who has custody of the triplets. The court refers the parties back to custody conciliation with all due haste.

Finally, the court asks that the plaintiff and defendant bear in mind that the best interests of the triplets are most important here. "To say that the child is merely the subject of the proceeding, not a 'party' to it, would be to return to the child-as-chattel mentality." *Stapleton v. Dauphin County Child Care Service,* 228 Pa. Super. 371, 392, 324 A.2d 562, 573 (1974). (Opinion of Spaeth, J., overruled on other grounds.) It is the hope of this court that a custodial tug-of-war will not begin here. It is additionally the court's hope that the legislature will address surrogacy matters in Pennsylvania to prevent cases like this one from appearing before the courts without statutory guidance.

## ORDER

And now, to wit, April 2, 2004, after reviewing the testimony and evidence presented, the briefs of counsel, and in consideration of the foregoing opinion, it is hereby ordered, adjudged and decreed that D.B. is the legal mother of the triplets, A, B and C, and therefore has standing to pursue custody. Since no legal mother was provided for in the surrogacy contract and because the contract encouraged parties to sign away legal rights belonging to the triplets, the court finds the contract to be null and void as against Pennsylvania public policy.

Further, D.B. has standing in loco parentis to pursue both custody and child support for A, B and C. As their biological father, J.F. has a legal duty to provide child support even if he disagrees with who has custody of the triplets.

The court further orders that a custody conciliation conference and support conference for the parties be scheduled immediately with the appropriate court related offices. The subsequent hearing dates of April 5, 2004, and April 16, 2004, are hereby cancelled.